## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | |
|---|---|
| IN RE:<br><br>HEADWAY WORKFORCE SOLUTIONS, INC., *et al.*[1]<br><br>　　　Debtors. | Bankruptcy No. 25-01682-5-JNC<br><br>Chapter 11<br><br>*(Joint Administration Requested)* |

**DEBTORS' EXPEDITED MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POST PETITION FINANCING, (II) GRANTING SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV)  GRANTING LIMITED RELIEF FROM THE <u>AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF</u>**

Headway Workforce Solutions, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases, hereby submit this motion (the "<u>Motion</u>") pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 for Entry of Interim and Final Orders in the substantive form of the Interim Order attached hereto as Exhibit "A" (1) authorizing the Debtors to obtain first priority and priming post-petition financing (the "<u>DIP Financing</u>"), (2) granting senior liens and super-priority administrative claims, (3) authorizing use of cash collateral, the extent applicable (4) granting limited relief from the automatic stay, (5) scheduling a final hearing, and (6) granting such other related relief as agreed to by and among the Debtors and Noor Strategies, Inc. and/or its affiliates (collectively, the "<u>DIP Lender</u>"). In support of this Motion, the Debtors submit the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors Federal Employer Identification Number: Headway Workforce Solutions, Inc. (4871); Staffing 360 Solutions Inc., (0859); Monroe Staffing Services LLC (1204); Key Resources, Inc. (9495); Lighthouse Placement Services, Inc. (8093).

Declaration of Brendan Flood filed contemporaneously herewith and incorporated herein by reference. In further support of this Motion, the Debtors state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105(a), 362(d), 363(b), 363(c), 364 and 507 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended; hereinafter the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.      On May 5, 2025 (the "Petition Date") the Debtors filed in this Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Their cases are being jointly administered.

4.      The Debtors have continued in the management and operation of their business and properties as debtors-in-possession pursuant to 11 U.S.C. §1107(a), 1108.

5.      No trustee or examiner has been appointed.

6.      Additional information relating to the Debtors' businesses, properties, capital structures and the circumstances predicating the commencement of these Chapter 11 cases is detailed in the First Day Declaration filed on the Petition Date.

## PRE-PETITION OBLIGATIONS

7.    As of the Petition Date, the Debtors' prepetition funded indebtedness consisted of the following (hereinafter, and unless otherwise noted, from time to time the "Lenders" set forth in the chart below shall be collectively referred to as the "Pre-Petition Lenders"):

| Name | Lender | Principal Amount (approx.) | Lien Priority and Collateral |
|---|---|---|---|
| MidCap Loan | MidCap Funding IV, Trust | $9,000,000 | 1st Priority lien on substantially all assets of the Debtors.<br><br>(**Primed** by DIP Financing on all assets except the pre-petition lien of MidCap in the Debtors' accounts receivable generated prior to March 10, 2025.) |
| Jackson Loan | Jackson Investment Group, LLC | $11,666,955.43 | 2nd Priority lien on substantially all assets of the Debtors.<br><br>(**Primed** by DIP Financing) |
| Bridge Loan | Noor Staffing Group, LLC | $766,000 | 3rd Priority lien on all of the Debtors' rights to payment on accounts receivable related to contracts in existence prior to March 10, 2025 and a 1st priority lien on any accounts receivable associated with new Contracts that Noor entered into pursuant to the MOU and the ASA whereby the Debtors may assert a beneficial interest on account of the Services being performed by Noor to their customers. |

### A.  The MidCap Loan

8.     The Debtors and MidCap Funding IV Trust, a Delaware statutory trust, as successor-by-assignment to MidCap Funding X Trust ("<u>MidCap</u>") are parties to that certain Credit and Security Agreement dated as of April 8, 2015 (the "<u>MidCap Loan</u>" and, together with all schedules and exhibits attached thereto and all amendments, agreements, documents, instruments and/or amendments executed and delivered in connection therewith, collectively, the "<u>MidCap Loan Documents</u>").

9.     The Debtors' obligations under or in connection with the MidCap Loan are secured by a first priority lien on substantially all assets and personal property of the Debtors.  As of the Petition Date, the outstanding amount owed under the MidCap Loan is approximately $9,000,000.00.

### B.  The Jackson Loan

10.     The Debtors and Jackson Investment Group, LLC ("<u>Jackson</u>") are parties to that certain Senior Secured Promissory Note dated August 29, 2023 (the "<u>Jackson Loan</u>" and, together with all schedules and exhibits attached thereto and all amendments, agreements, documents, instruments and/or amendments executed and delivered in connection therewith, collectively, the "<u>Jackson Loan Documents</u>").

11.     The Jackson Loan is secured by a second priority lien on substantially all assets of the Debtors.  As of the Petition Date, the outstanding principal amount owed under the Jackson Loan is approximately $11,666,955.43.

### C. The Bridge Loan

12.    The Debtors and Noor Staffing Group, LLC ("Noor")[2] are parties to that certain Revolving Loan Promissory Note, dated February 23, 2025 (the "Bridge Loan,"), that certain Continuing Security Agreement effective as of February 23, 2025 between Debtors and Noor, and certain UCC Financing Statements filed by Noor as secured party (collectively, the "Bridge Loan Documents").

13.    The Debtors' obligations arising under, or in connection with, the Bridge Loan Documents are secured by a lien in all of the Debtors' accounts receivables related to those certain "360 Contracts" as of March 10, 2025 (collectively, the "Accounts") as more particularly described and set forth in Schedule A to that certain Continuing Security Agreement effective February 23, 2025.  Noor's liens in the Accounts were perfected by the filing of Uniform Commercial Code Financing Statements. As of the Petition Date, the outstanding principal amount under the Bridge Loan is approximately $766,000.

### D. Debtors' Need for DIP Financing

14.    The Debtors' operations were previously funded by MidCap.

15.    On or about March 7, 2025, MidCap informed the Debtors that it would no longer advance the funds needed by the Debtors for payroll and operations and swept all or substantially all of the Debtors' operating funds.

16.    As a result of MidCap's actions, the Debtors were no longer able to service their customers and pay their employees in the ordinary course of business.

17.    On or about March 19, 2025, the Debtors, MidCap and Noor entered into a Memorandum of Understanding ("MOU") whereby Noor agreed to, *inter alia*, to advance the

---

[2] Noor is an affiliate of the DIP Lender.

certain funds to the Debtors to employ and cover the costs and expense of the Debtors' employees and other mutually agreed upon operational costs (the "Operating Funds").

18.      Under the MOU, Noor agreed to cooperate with MidCap and assist with collecting the accounts receivable that served as the collateral for the MidCap Loan.

19.      Under the MOU, MidCap agreed to reimburse Noor for Operating Funds in the approximate amount of $2,744,900 (the "Reimbursement Obligations").

20.      As a result of the Operating Funds, the Debtors were able to continue their operations,  service their customers, avoid material breaches of contract, and thereby pay down the MidCap Loan all at the expense of Noor.

21.      From the date of the execution of the MOU through May 9, 2025, as a result of Noor advancing the Operating Funds and its substantial contributions to the collections process, MidCap has been able to collect more than $11,000,000 of the Debtors' accounts receivable all the while avoiding substantial claims that could have been asserted by the Debtors' customers on account of material breaches of contract or other similar claims.

22.      Noor continues to assist MidCap in the collection of the Debtors' pre-petition accounts receivable.  Noor's actions have substantially contributed to MidCap's reduction in the indebtedness owed by the Debtors.

23.      Noor and the Debtor are also parties to that certain Administrative Services Agreement ("ASA") effective as of February 23, 2025 whereby Noor agreed to perform certain services for the Debtors, as more particularly set forth in the ASA.  In order to perform the Services, Noor lent money to the Debtors and/or paid certain costs and expenses on the Debtors' behalf. All funds advanced or otherwise loaned to the Debtor in accordance with the ASA or the MOU make up the amounts due pursuant to the Bridge Loan Documents.

24.     The Bridge Loan consists of all amounts advanced by Noor to the Debtors to cover (i) the costs associated with unpaid payroll obligations, related costs, and ordinary expenses that were not otherwise related to the Reimbursement Obligation; (ii) all additional amounts advanced under the terms of this ASA to the Budget; and (iii) all amounts included as the Reimbursement Obligation, as defined in the MOU that are not otherwise reimbursed by MidCap.

25.     DIP Lender has agreed to make a DIP loan to the Debtors in order to provide necessary capital to the Debtors to fund their post-petition operations conditioned upon the terms of the DIP Financing Agreement which includes a roll up of all amounts due and owing pursuant to the Bridge Loan into the DIP Financing.

26.     By making the DIP loan, DIP Lender believes it is further advancing the Parties' goals set forth in the MOU and the ASA.

### E. Debtors' efforts to obtain DIP financing without a Priming Lien

27.     The Debtors have engaged in discussions with other parties regarding their need for DIP financing on a non-priming basis.  The Debtors were not able to obtain this financing on an unsecured basis without agreeing to grant a first priority priming lien on certain of the estates' post-petition assets.

### **RELIEF REQUESTED**

28.     Debtors move for entry of an interim order (the "Interim Order"), substantially in the same form attached hereto as Exhibit "A", and ultimately, where applicable, a final order (the "Final Order" and together with the Interim Order, collectively the "Financing Orders") containing, *inter alia*, the following relief:

    (a) authorizing the Debtors to obtain post-petition secured financing from the DIP Lender under the DIP Financing pursuant to the terms set forth in the Debtor-In-Possession Financing Agreement (as subsequently amended, restated, or otherwise modified from time to time, the "DIP Financing Agreement"), attached hereto at Exhibit B;

     i.     A non-revolving draw facility of up to $766,000 (the "Interim Loan") until the earlier of (a) the entry of the Final Order or (b) the Termination Date.  A portion of the Interim Facility equal to the outstanding principal balance and accrued interest due under the Bridge Loan shall be used solely to pay in full the Bridge Loan. If a Final Order is not entered or upon the Termination Date, all amounts outstanding under the Interim Facility shall be immediately due and payable to Lender in full.

     ii.     After entry of the Final Order, DIP Lender will make available to Borrowers a non-revolving credit facility of up to $1,130,000 (the "DIP Financing"). For the avoidance of doubt, this $1,130,000 non-revolving credit facility shall include, and is not in addition to, the Interim Loan under subparagraph (a)(i) above.

(b) granting of a priming lien on the DIP Collateral pursuant to section 364(d)(1) of the Bankruptcy Code, subject to a carve-out for allowed estate fees and expenses and the pre-petition lien of MidCap in the Debtors' accounts receivable generated prior to March 10, 2025;

(c) granting the DIP Financing super-priority administrative expense status (pursuant to sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code), subject to the carve-out;

(d) authorizing the Debtors to use cash collateral with the DIP Lender and other secured parties have an interest pursuant to section 363 of the Bankruptcy Code;

(e) authorizing the Debtors to execute and deliver additional documentation consistent with the terms of, or as may be required by, the DIP Financing upon entry of the proposed Interim Order;

(f) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the Final Order;

(g) scheduling an interim hearing on the Motion pursuant to Fed. Bankr. R. P. 4001 and authorizing, from the entry of the Interim Order until the final hearing on the Motion to obtain credit subject to the terms and conditions set forth in the DIP Financing Agreement; and

(h) scheduling a Final Hearing on the Motion pursuant to Fed. Bankr. R. P. 4001, and establishing notice procedures in respect of this Final Hearing by this Court to consider entry of the Final Order authorizing the relief requested in this Motion on a permanent basis.

## SUMMARY OF TERMS OF DIP FINANCING

29.    In accordance with Rule 4001(c)-(d) of the Bankruptcy Rules, the chart below summarizes material terms of the DIP Financing proposed under the DIP Financing Agreement and Interim Order[3]:

| | |
|---|---|
| **Borrowers**<br>See DIP Financing Agreement, Preamble | Each of the Debtors, jointly and severally |
| **DIP Lender**<br>See DIP Financing Agreement, Preamble | Noor Strategies, Inc. |
| **Amount and Facility**<br>See DIP Financing Agreement, § 3 | A senior secured super priority debtor in possession financing consisting of a non-revolving draw facility, which includes a roll up of the amounts outstanding as of the Petition Date under the Bridge Loan, in the maximum aggregate principal amount of $1,130,000. |
| **Interest Rate**<br>See DIP Financing Agreement, § 3.3 | The DIP Financing will bear interest at a non-default rate of sixteen percent (16%) per annum. |
| **Default Interest**<br>See DIP Financing Agreement, § 11 | At any time an Event of Default (defined below) has occurred and is continuing, the DIP Financing shall bear interest at nineteen percent (19%) per annum. |
| **Termination Date**<br>See DIP Financing Agreement, §15.14 | The earliest date to occur of (a) thirty (30) days after entry of the Interim Order if the Final Order has not been approved by the Bankruptcy Court on or prior to that date, (b) one hundred and fifty (150) days after entry of the Final Order, (c) approval by the Bankruptcy Court of the sale of substantially all of the assets of the Borrowers, (d) the effective date of a plan of reorganization under the Bankruptcy Case that has been confirmed pursuant to an order of the Bankruptcy Court or (e) such earlier date on which the DIP Lender's commitment to lend hereunder terminates in accordance with the terms of the DIP Financing Agreement. |

---

[3] This summary, including the defined terms it uses (whether or not defined within the summary), is qualified in its entirety by the provisions of the DIP Loan Documents and the Interim Order, as applicable. To the extent that there are any conflicts between this summary, on the one hand, and any DIP Loan Document or the Interim Order, as applicable, on the other, the terms of such DIP Loan Document or the Interim Order, as applicable, shall govern.

| | |
|---|---|
| **Security and Priority**<br>See DIP Financing<br>Agreement, § 5 | To secure the DIP Financing, effective as of entry of the Interim Order, and subject only to the Carve-Out and the pre-petition lien of MidCap in the Debtors' accounts receivable generated prior to March 10, 2025, the DIP Lender is granted a continuing, valid, binding, enforceable, non-avoidable, automatically and properly perfected, first priority, post-petition security interests (collectively, the "<u>DIP Liens</u>") in and/or on all personal property and other assets, and the proceeds thereof, whether now existing or hereafter arising (including, without limitation, estate causes of action under sections 510, 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, together with the proceeds thereof (the "<u>Avoidance Claims</u>") and except, subject to entry of a Final Order approving that relief, and wherever located, tangible and intangible, of the Debtors and their estates (collectively, the "<u>DIP Collateral</u>").<br><br>Subject to the Carve-Out, the DIP Obligations shall be entitled to superpriority administrative expense claim status, with priority over any and all administrative expense claims (the "<u>Superpriority Claims</u>"). |
| **DIP Budget**<br>See DIP Financing<br>Agreement, § 8.1<br>Interim Order, Exhibit A | The use of proceeds of the DIP Financing is subject to an operating budget setting forth the projected financial operations of the Debtors, which budget shall be in form and substance satisfactory to the DIP Lender in its sole and absolute discretion (the "<u>Operating Budget</u>").<br><br>The Debtors represent that the Operating Budget contains all expenses that are reasonable and necessary for the operation of the Debtors' business and the preservation of the DIP Collateral through the period for which the Operating Budget runs, and therefore includes any and all items potentially chargeable to DIP Lender under section 506(c) of the Bankruptcy Code. Therefore, in the exercise of its prudent business judgment, and subject to entry of the Final Order, Debtors agree that there will be no surcharge of the DIP Collateral for any purpose unless agreed to in writing by DIP Lender, and effective upon entry of the Final Order. |
| **Funding Use of Proceeds**<br>See DIP Financing<br>Agreement, § 4 | Subject to entry of the Interim Order and Final Orders, the amount of $1,130,000 shall be available for post-petition administrative obligations as set forth in the Operating Budget. Subject to the Operating Budget, such amount may |

| ¶ | be used to (i) repay the Bridge Loan, subject to entry of the Interim Order (ii) finance the ongoing general corporate needs of the Debtors incurred during these cases, and (iii) pay for allowed administrative expenses incurred during these cases. |
|---|---|

## **BASIS FOR RELIEF**

*A. Entering into the DIP Financing Is a Sound Exercise of Business Judgment*

30.     If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. See, e.g., *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving post-petition financing on an interim basis as exercise of debtors' business judgment).

31.     To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable businessperson would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at \*97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). In considering whether the terms of post-petition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003).

32.     The Debtors' decision to enter into the proposed DIP Financing is in the exercise of its sound business judgment. See, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to sustain sea-sonal business).

*B. The Debtors Should Be Authorized to Obtain DIP Financing on a Secured and Superpriority Basis.*

33.     Sections 364 of the Bankruptcy Code in relevant part, provides:

(c) If the trustee is unable to obtain unsecured credit allowable under Section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-

   (1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

   (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
   (3) secured by a junior lien on property of the estate that is subject to a lien.

(d)(1) The court, after notice and a hearing may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate subject to a lien only if-

   (A) the trustee is unable to obtain such credit otherwise; and

   (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. §§ 364(c) and (d).

34.     Leading up to Debtors' filing the Chapter 11 cases, Debtors unsuccessfully explored alternatives and engaged in negotiations in order to obtain additional financing and liquidity.

35.     Debtors submit that MidCap is adequately protected because the Debtors have carved out the pre-petition liens of MidCap in the pre-petition accounts receivable generated prior to March 10, 2025 from the priming DIP Lien, the Debtors consent to relief from the automatic stay in order to allow MidCap to continue to collect its pre-petition accounts receivable and without the Bridge Loan and the Dip Loan, MidCap would not have been able to collect the pre-petition accounts receivable that resulted in a significant paydown of MidCap's prepetition debt.

36.     Moreover, by consenting to relief from stay to allow MidCap to collect its pre-petition accounts receivable, MidCap's Loan will continue to be paid down during the course of these bankruptcy cases.

37.     By way of further explanation, as of the date of the MOU, the principal balance due to MidCap was approximately $11,000,000 which was fully secured by more than $17,000,000 of Debtors' current accounts receivable.  As of the date of the petitions, the approximate amount due to MidCap under the prepetition loans was $9,000,000 inclusive of principal, interest, fees, costs and the Reimbursement Obligation which is secured by approximately $8,700,000 of current accounts receivable in addition to all other assets of the Debtors.

38.     The Debtors believe that MidCap is over-collateralized by way of their current accounts receivable, the tangible and intangible assets of the Debtors, as well as valuable net operating loss tax credits which they expect to be the subject of a potential sale to Jackson.  Said, differently, the Debtors' assets securing the MidCap indebtedness sufficiently exceed the amounts due to MidCap thereby permitting the DIP Financing to be a priming loan obligation post-petition.

39.     Accordingly, the Pre-Petition Lenders shall not be harmed by the Court's approval of the DIP Financing.

40.     Considering the immediacy of Debtors' financing needs, as well as the Pre-Petition Debt, Debtors and their professionals determined that additional unsecured financing was not available. Therefore, Debtors were unable to obtain alternative post-petition financing through credit allowable as an administrative expense or secured by liens on assets junior to those of the Pre-Petition Lenders.

41.     Debtors engaged in good faith, arm's-length negotiations with the DIP Lender, with the result of these negotiations being the DIP Financing and the form of the proposed Interim Order.

## REQUEST FOR EXPEDITED RELIEF

42.     In the instant cases, just cause exists for the Court to hold an expedited hearing on this matter because obtaining a determination on the Motion under the normal notice period would cause the Debtors to incur harm.

43.     As discussed above the Debtors have an immediate need for post-petition financing in order to continue operating the business and maintaining its assets. The DIP Financing is critical to the Debtors' continued day-to-day operations.

44.     The DIP Financing provided for under the Interim Order will enhance the value of the property of the estate and avoid a loss of value that would result if operations were interrupted.

45.     The need for expedited hearing was not caused by lack of due diligence because the instant Motion and substantive relief was not available to the Debtors until the petition was filed and the instant Motion was filed shortly thereafter.

46.     Accordingly, the Debtors respectfully request the Court schedule the Motion for hearing on an expedited basis.

## RESERVATION OF RIGHTS

47.     Nothing stated herein shall be deemed as an admission by the Debtors as to the validity, amounts, or secured status of the claims and/or debts to the Pre-Petition Lenders. The Debtors expressly reserve the rights to object to any claim, seek to avoid any lien purportedly created under the applicable loan documents and/or take any other action to dispute the aforementioned claims.

## NO PRIOR REQUEST

48.     This is the Debtors' first Motion seeking the relief as stated herein, and to prior request for said relief has been made by the Debtor or Debtors' Counsel.

## NOTICE

49.     Notice of the Motion is being given as required by Bankruptcy Rule 4001 to (i) the Office of the Bankruptcy Administrator, (ii) the twenty (20) largest unsecured creditors of Debtor, (iii) counsel for DIP Lender, (v) the Prepetition Secured Lenders and (iv) all parties in interest that have filed a Notice of Appearance.

WHEREFORE, the Debtors respectfully request entry of the Proposed Interim Order and the Proposed Final Order granting the relief requested herein and such other relief that is just and proper.

Dated: May 15, 2025

**HENDREN, REDWINE MALONE, PLLC**
s/ Rebecca Redwine Grow
Jason L. Hendren (NC State Bar No. 26869)
Rebecca Redwine Grow (NC State Bar No. 37012)
Benjamin E.F.B. Waller (NC State Bar No. 27680)
Lydia C. Stoney (NC State Bar No. 56697)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone:  (919) 573-1422
Facsimile:  (919) 420-0475
Email: jhendren@hendrenmalone.com
        rredwine@hendrenmalone.com
        bwaller@hendrenmalone.com
        lstoney@hendrenmalone.com
and

**BERNSTEIN-BURKLEY, P.C.**
/s/ *Kirk B. Burkley*
Kirk B. Burkley (WV ID No. 11767)
601 Grant Street, 9th Floor
Pittsburgh, PA 15219-1900
Telephone: (412) 456-8100
Facsimile: (412) 456-8135
Email: kburkley@bernsteinaw.com
*Attorney for the Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | |
|---|---|
| IN RE:<br><br>HEADWAY   WORKFORCE   SOLUTIONS, INC., *et al.*[4]<br><br>      Debtors. | Bankruptcy No. 25-01682-5-JNC<br><br><br>Chapter 11 (Jointly Administered) |

## NOTICE OF MOTION

NOTICE IS HEREBY GIVEN of the DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POST PETITION FINANCING, (II) GRANTING SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING LIMITED RELIEF FROM THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF ("Motion") filed simultaneously herewith in the above captioned case; and,

FURTHER NOTICE IS HEREBY GIVEN that this Motion may be allowed provided no response and request for a hearing is made by a party in interest in writing to the Clerk of this Court by **4:00 p.m. on May 19, 2025**; and

FURTHER NOTICE IS HEREBY GIVEN that a hearing will be conducted on the Motion and any response thereto at **1:00p.m. on May 20, 2025** at the United States Bankruptcy Court, located at 150 Reade Circle, Greenville, North Carolina.

DATED:  May 15, 2025    **HENDREN, REDWINE MALONE, PLLC**

s/ Rebecca Redwine Grow
Jason L. Hendren (NC State Bar No. 26869)
Rebecca Redwine Grow (NC State Bar No. 37012)
Benjamin E.F.B. Waller (NC State Bar No. 27680)
Lydia C. Stoney (NC State Bar No. 56697)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone:  (919) 573-1422
Facsimile:  (919) 420-0475
Email: jhendren@hendrenmalone.com

---

[4] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors Federal Employer Identification Number: Staffing 360 Solutions, Inc. (0859); Monroe Staffing Services LLC (1204); Key Resources, Inc. (9495); Lighthouse Placement Services, Inc. (8093).

rredwine@hendrenmalone.com
bwaller@hendrenmalone.com
lstoney@hendrenmalone.com

**EXHIBIT A**

**PROPOSED ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION**

| | |
|---|---|
| IN RE:<br><br>HEADWAY WORKFORCE SOLUTIONS, INC., *et al.*[1]<br><br>      Debtors. | Bankruptcy No. 25-01682-5-JNC<br><br>Chapter 11<br><br>*(Joint Administration Requested)* |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING LIMITED RELIEF FROM THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

_____

THIS MATTER is before this Court on the expedited motion [Doc. No.__ ] (the "DIP

Motion") of the Debtors (a) seeking this Court's authorization pursuant to sections 364(c)(1),

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors Federal Employer Identification Number: Headway Workforce Solutions, Inc. (4871); Staffing 360 Solutions Inc., (0859); Monroe Staffing Services LLC (1204); Key Resources, Inc. (9495); Lighthouse Placement Services, Inc. (8093).

364(c)(2) and 364(c)(3) of the United States Code (the "Bankruptcy Code") and Rules 2002,

4001(b), (c) and (d) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") for the Debtors, *inter alia*, to obtain secured Post-Petition loans, advances and other

accommodations (the "DIP Financing") from Noor Strategies, Inc., a New York corporation, or its

assignee (the "DIP Lender"), secured by first priority security interests in and liens upon the DIP

Collateral (defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code,

(b) seeking this Court's authorization, pursuant to section 362 of the Bankruptcy Code, to grant

limited relief from the automatic stay to allow the DIP Lender to apply proceeds of the Debtors'

accounts receivable and other Collateral to the outstanding balance of the Post-Petition

Indebtedness (defined below); (c) seeking this Court's authorization, to the extent applicable, to

use the "cash collateral" (as that term is used and defined in the Bankruptcy Code) of the DIP

Lender and in which other secured parties claim to have an interest and to provide protection,

including but not limited to, superpriority claims to the DIP Lender for said use and other adequate

protection to such other secured parties; (d) scheduling a final hearing for entry of an order granting

the relief requested in the DIP Motion on a final basis (the "Final Order") and approving the form

of notice with respect to the Final Hearing (as defined below) pursuant to Rules 2002, 4001 and

9014 of the Federal Rules of Bankruptcy Procedures; and (e) granting related relief in favor of the

DIP Lender;

   THIS COURT HEREBY FINDS AND CONCLUDES THAT:

   A.   On May 5, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Code"). The Debtors are debtors-

in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Their cases

(collectively, the "Chapter 11 Case") are being jointly administered.

B.      This Court has jurisdiction over the Chapter 11 Case and the DIP Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the DIP Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

C.      The Debtors state that as of the Petition Date, the aggregate amount of approximately $9,000,000 was due and owing with respect to loans made by MidCap Funding IV Trust, a Delaware statutory trust, as successor-by-assignment to MidCap Funding X Trust ("MidCap") pursuant to certain prepetition financing documents (collectively, the "MidCap Loan Documents" and the "MidCap Indebtedness").

D.      The MidCap Indebtedness is secured by a first priority lien on substantially all assets and personal property of Monroe Staffing Services, LLC, Staffing 360 Solutions, Inc., Lighthouse Placement Services, Inc., Key Resource, Inc. and Headway Workforce Solutions, Inc.

E.      The Debtors state that as of the Petition Date, the aggregate amount of approximately $11,666,955.43 was due and owing with respect to loans made by Jackson Investment Group, LLC ("Jackson" and together with MidCap, collectively the "Pre-Petition Lenders") pursuant to those certain prepetition financing documents (collectively, the "Jackson Loan Documents" and the "Jackson Indebtedness").

F.      The Jackson Indebtedness is secured by a second priority lien on substantially all assets of Monroe Staffing Services, LLC, Staffing 360 Solutions, Inc., Lighthouse Placement Services, Inc., Key Resource, Inc and Headway Workforce Solutions, Inc.

G.      The Debtors state that as of the Petition Date, the aggregate amount of approximately $766,000 was due and owing in respect of loans and other financial accommodations made by the DIP Lender to the Debtors pursuant to certain prepetition financing documents (collectively, the "Bridge Loan Documents" and the "Bridge Loan Indebtedness").

H.      To secure the Bridge Loan Indebtedness and pursuant to the Bridge Loan Documents, the Debtors granted to the DIP Lender security interests in certain property of the Debtors as described in the Bridge Loan Documents. The collateral encumbering the Bridge Loan Indebtedness shall be referred to herein as the "Bridge Loan Collateral", and such liens in favor of the DIP Lender shall be referred to herein as the "Bridge Loan Liens".

I.      The Debtors state that the Bridge Loan Liens constitute valid, binding, enforceable, and perfected liens in and to the Bridge Loan Collateral and are not subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

J.      An immediate and critical need exists for the Debtors to obtain funds in order to continue the operations of their businesses. The Debtors state that they do not have sufficient available sources of working capital and financing to operate in the ordinary course of business or to operate their businesses and to maintain their property in accordance with state and federal laws without the DIP Financing from the DIP Lender described in this Interim Order. The Debtors' ability to maintain business relationships with their customers and to otherwise finance their business operations is essential to the Debtors' Chapter 11 Case. In addition, for the reasons set forth by the Debtors in the DIP Motion and at the hearing on the DIP Motion (the "Hearing"), the Debtors' need for financing is immediate. In the absence of the DIP Financing, the continued operation of the Debtors' business would not be possible, causing serious and irreparable harm to the Debtors and their estates.

K.      The Debtors state that the DIP Lender would not agree to provide DIP Financing to the Debtors except under the terms of this Interim Order and the DIP Financing Agreement, assuring that the liens and the various claims, superpriority claims, and other protections granted to the DIP Lender pursuant to this Interim Order will not be affected by any subsequent reversal

or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the post-petition financing arrangement contemplated by this Interim Order and the DIP Financing Agreement. The DIP Lender has acted in good faith, as that term is used in section 364(e) of the Bankruptcy Code, consenting to and in agreeing to provide the post-petition financing to the Debtors contemplated by this Interim Order and the DIP Financing Agreement.

L.      The DIP Lender is only willing to make the DIP Financing available to the Debtors: (a) pursuant to the terms and condition of this Interim Order and the DIP Financing Agreement; (b) provided that this Court enters this Interim Order; and (c) the Debtors comply with each and every term and condition of this Interim Order and any DIP Loan Documents (as defined below) or agreements entered into by and between the Debtors and the DIP Lender, including but not limited to the DIP Financing Agreement.

M.      Given the Debtors' current financial condition, the Debtors assert that they cannot obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or otherwise. The Debtors further assert that financing on a post-petition basis is not otherwise available without the Debtors: (i) granting to the DIP Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, (ii) securing, pursuant to sections 364(c) and (d) of the Bankruptcy Code, such indebtedness and obligations with first priority security interests in and liens on all of the assets and property of the Debtors, i.e., the DIP Collateral, subject only to the Carve-Out and the pre-petition lien of MidCap in the Debtors' accounts receivable generated prior to March 10, 2025, (iii) providing for adequate protection of the DIP Lender's interests in the DIP Collateral as described in this Interim Order

and (iv) granting the DIP Lender, subject to provisions set forth in this Interim Order, limited relief without further order of this Court.

N.    Notice of the Hearing and the relief requested in the DIP Motion has been given to (i) the Office of the United States Bankruptcy Administrator, (ii) counsel to the DIP Lender, (iii) the Debtors' twenty largest unsecured creditors, (iv) the Pre-Petition Lenders; and (vi) all other known parties asserting a lien on or security interest in the Debtors' assets or property. Under the circumstances, such notice of the Hearing and the relief requested in the DIP Motion constitutes adequate and sufficient notice under sections 105, 362(d), 363(b), 363(c) and 364(d) of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, and no other notice need be given under the facts and circumstances.

O.    Based on the record presented to this Court by the Debtors at the Hearing, this Court finds that the DIP Financing, the DIP Loan Documents and this Interim Order were negotiated in good faith and at arm's length between the Debtors and the DIP Lender and any credit extended and loans made to the Debtors as part of the DIP Financing shall be deemed to have been extended, issued or made, as the case may be, in good faith by the DIP Lender as required by, and within the meaning of, section 364(e) of the Bankruptcy Code. As such, the DIP Lender is entitled to all the protections afforded under section 364(e) of the Bankruptcy Code.

P.    Based on the record presented to this Court by the Debtors at the hearing, the terms of the DIP Financing, the DIP Financing Agreement, the DIP Loan Documents and this Interim Order are fair and reasonable, are ordinary and appropriate for secured financing under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and is supported by reasonably equivalent value and fair consideration.

Q.      The financing and adequate protection arrangements authorized in this Interim Order, in the DIP Financing Agreement and the DIP Loan Documents have been negotiated in good faith and at arm's length among the Debtors and the DIP Lender. The terms of such financing and adequate protection arrangements are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

R.      Based upon the record at the Hearing, the DIP Lender, the Pre-Petition Lenders  and any other secured parties' respective interests in cash collateral and in any other property of the Debtors or their estates are adequately protected, including by virtue of the provisions of this Interim Order.

S.      The Debtors have requested immediate entry of this Interim Order. The permission granted in the Interim Order to enter into the DIP Financing with the DIP Lender and to obtain funds thereunder and for relief from the automatic stay to, among other things, apply certain of the proceeds of the DIP Financing to satisfy the Bridge Loan Indebtedness, is necessary to allow the Debtors to reorganize. This Court concludes that entry of this Interim Order is in the best interest of the Debtors' estates and their creditors as implementation of this Interim Order will, among other things, provide the Debtors with the necessary liquidity to sustain the operation of the Debtors' business during this Chapter 11 Case.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, EFFECTIVE IMMEDIATELY, AND AGREED AMONG THE PARTIES HERETO THAT:**

1.      The DIP Motion is granted, subject to the terms and conditions set forth in  this Interim Order and in the Debtor-In-Possession Financing Agreement (the "DIP Financing Agreement"), a copy of which is attached hereto and incorporated herein as "Exhibit 1".

2.      The Debtors are hereby authorized and empowered to borrow money and seek other financial accommodations from the DIP Lender up to a maximum amount of $1,130,000 and, to the extent applicable, use the "cash collateral" (as said term is used in the Bankruptcy Code) of the DIP Lender and in which any other secured parties claim to have an interest, effective upon entry of this Interim Order pursuant to the terms and conditions of this Interim Order and the DIP Financing Agreement and any other post-petition loan documents and credit agreements reasonably requested by the DIP Lender, (collectively, the "DIP Loan Documents"). The Debtors are authorized to use the proceeds of the DIP Financing (a) to satisfy the Bridge Loan Indebtedness, subject to the entry of the Interim Order; and (b) in the operation of their businesses, provided, that the use of the DIP Financing is consistent with the terms of this Interim Order and the DIP Financing Agreement and will only be used to pay, when due, the disbursements set forth in the Budget (defined below). All Post-Petition obligations, liabilities and indebtedness owed by the Debtors to the DIP Lender, of whatever kind, nature or description arising hereunder, are referred to herein as the "Post-Petition Indebtedness" or the "Obligations".

3.      The Debtors agree and this Court finds that all cash of the Debtors wherever located represents proceeds of loans or other financial accommodations from the DIP Lender to the Debtors or proceeds of the DIP Collateral. The Debtors further agree and this Court finds that the DIP Lender, except as otherwise set forth herein, has a first, valid, and perfected security interest in and lien on all of the Debtors' cash and that those funds constitute "cash collateral" of the DIP Lender within the meaning of section 363(a) of the Bankruptcy Code, wherever said cash is located and whether or not in the possession of the DIP Lender.

4.      The Debtors shall use the proceeds of the DIP Loan, the advances made pursuant to the DIP Loan Documents by the DIP Lender and, to the extent applicable, the cash collateral of

the DIP Lender solely (a) to satisfy the Bridge Loan Indebtedness subject to the entry of the Interim Order; (b) for the payment of the costs and expenses set forth on the budget, a copy of which is attached hereto as Exhibit 2 (the "Budget"); and (c) to pay the interest, reasonable and customary fees, costs, expenses and other reasonable and customary charges payable by the Debtors to the DIP Lender incurred in connection with this Interim Order and the DIP Financing Agreement (regardless of whether such items are set forth in the Budget). The Budget may only be modified by the written agreement of the Debtors and the DIP Lender, with prior written notice to this Court and the Office of the United States Bankruptcy Administrator.

5.      Notwithstanding any other provision of this Interim Order, the DIP Financing Agreement or the DIP Loan Documents, the DIP Lender shall not have any obligation or commitment to make any DIP Loans pursuant to this Interim Order or the DIP Financing Agreement until the conditions precedent provided for herein have been satisfied.

6.      As consideration for the financial accommodations set forth in this Interim Order and in the DIP Financing Agreement (including the Carve-Out, as defined below), no other costs or administrative expenses, pursuant to sections 506(c) and/or 105(a) of the Bankruptcy Code or otherwise, that have been or may be incurred in the Chapter 11 Case, in any proceeding related hereto or in any superseding chapter 7 case, and no priority claims are or will be prior to or on parity with the superpriority claims of the DIP Lender. In no event shall any such costs or expenses of administration be imposed upon the DIP Collateral without the prior written consent of the DIP Lender and no such consent shall be implied from any action, inaction, or acquiescence. The DIP Lender shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

7.       As security for the DIP Indebtedness, the DIP Lender shall have and the DIP Lender is hereby granted to the extent necessary (without the necessity of the recordation of mortgages, security agreements, pledge agreements, assignments, control agreements, financing statements or otherwise), (a) valid and perfected senior and first priority security interests in, and liens on the DIP Collateral which consists of all property and interests in property of the Debtors whether acquired by the Debtors and the Debtors' estate prior to the Petition Date or from and after the Petition Date but subject to excepting the Carve-Out (defined below) and the pre-petition lien of MidCap in the Debtors' accounts receivable generated prior to March 10, 2025, including, without limitation, the following (such property shall collectively be referred to as the "DIP Collateral"): (i) accounts receivable, (ii) equipment, (iii) inventory and other goods, (iv) instruments and documents of title, (v) general intangibles (including, without limitation, all trademarks, patents, rights under licenses (whether as licensor or licensee) and other intellectual property, rights with respect to insurance policies, state, federal and foreign tax and duty refunds, open purchase orders, customer lists rights under leases), (vi) investment property, (vii) real estate owned or leased by the Debtors, (viii) all monies, securities, cash, cash equivalents contained in deposit accounts maintained by or for the benefit of the Debtors, (ix) commercial tort claims, (x) letter of credit rights, (xi) rights under leases of real property, (xii) all books and records (including electronic media) of the Debtors, (xiii) equity interests of the Debtors in any subsidiaries or affiliates, and (xiv) the proceeds and products of all of the foregoing, including, without limitation, and to the extent of the diminution, if any, in the value of the DIP Collateral from and after the Petition Date, any claims, causes of action, and proceeds, or recoveries thereof arising under the avoidance provisions of chapter 5 of the Bankruptcy Code (collectively, the "Avoidance Actions"). Subject to and except for the Carve-Out and the pre-petition lien of MidCap in the Debtors' accounts

receivable generated prior to March 10, 2025, the liens granted to the DIP Lender in the DIP Collateral pursuant to this Interim Order, the DIP Financing Agreement, and the DIP Loan Documents to secure the Post-Petition Indebtedness shall not be subordinated to or made pari passu with any other lien or security interest of any other party.

8.      Subject to and except for the Carve-Out, in accordance with section 364(c)(1) of the Bankruptcy Code, the Post-Petition Indebtedness shall constitute administrative expense claims with priority in payment over any and all other administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 506(c), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code (the "Superpriority Claims"), and shall at all times be senior to the rights of the Debtors, any subsequently appointed chapter 7 or chapter 11 trustee, any of the Debtors' creditors, including but not limited to any party that may seek to assert a claim or lien for taxes against the Debtors or any party that may seek to assert a claim or lien against the Debtors for reclamation or under section 503(b)(9) of the Bankruptcy Code. Subject to and except for the Carve-Out or as otherwise specifically set forth herein, no cost or expense of administration under sections 105, 364(c)(1), 503(b), 506(c), 507(b) of the Bankruptcy Code or otherwise, including those resulting from the conversion of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, shall be senior to, or pari passu with, the Superpriority Claims of the DIP Lender arising out of the Post-Petition Indebtedness and the DIP Collateral will not be subject to surcharge under section 506(c) of the Bankruptcy Code or otherwise in the Chapter 11 Case or any subsequent chapter 7 case of the Debtors. The Debtors are authorized and directed to execute, deliver, perform and comply with the terms and covenants in the DIP Financing Agreement

attached to this Interim Order, and in any other DIP Loan Documents, which shall be filed with this Court prior to the final hearing on the DIP Motion.

9.      Subject only to the Carve-Out and the pre-petition lien of MidCap in the Debtors' accounts receivable generated prior to March 10, 2025 and except for as expressly set forth in this Interim Order: (a) the liens and security interests granted in this Interim Order to secure the DIP Loan shall not be subject to any lien which is avoided and preserved for the benefit of the Debtors' estate under section 551 of the Bankruptcy Code; and (b) the liens and security interests granted in this Interim Order shall not be subordinated to or made pari passu with any other lien under section 364(d) of the Bankruptcy Code or otherwise, including but not limited to, the Bridge Loan Liens, the liens or claims of any party that may seek to assert a lien or claim against the Debtors for unpaid taxes and any party that may seek to assert a claim or lien against the Debtors for reclamation of goods or under section 503(b)(9) of the Bankruptcy Code.

10.     The liens, security interests and super-priority administrative expense claims of the DIP Lender shall be subject to and subordinate to the following (the "Carve-Out"): (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Bankruptcy Administrator under 28 U.S.C. Section 1930; (b) compensation and reimbursement of expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code to professionals retained by the Debtors or by any official committee of unsecured creditors (if one is formed) in this Chapter 11 Case, pursuant to sections 327, 328 and 363 of the Bankruptcy Code but only in the amount(s) set forth in the Budget;; and (c) the payment to DIP Lender or to any affiliate of DIP Lender of any breakup, topping or similar and any expense reimbursement that is approved at any time by this Court in connection with any transactional agreement to which the DIP Lender or such affiliate and the Debtors are parties. For the avoidance of doubt, and except as permitted or

provided in paragraph [12] below, the Carve-Out shall not be used to pay professional fees and expenses in connection with (i) asserting any claims or causes of action against the DIP Lender or any of its affiliates or officers, members or employees, (ii) challenging or raising any defense with respect to the obligations of the Debtors hereunder or any lien, whether pre-petition or post-petition, from the DIP Lender to the Debtors and/or (iii) taking any action to hinder or delay the rights of the DIP Lender or any of its affiliates or officers, members or employees.

11.     Except as permitted or provided in paragraph [12] below, DIP Financing may not be used to (a) contest, hinder or delay the DIP Lender's enforcement of this Interim Order or any Final Order or the DIP Lender's' realization upon any of the DIP Collateral (subject to the terms of this Interim Order, the Financing Agreement and the DIP Loan Documents) and the DIP Financing Agreement; (b) seek to sell the DIP Collateral, if the anticipated sale proceeds or consideration will not be sufficient to pay the Post-Petition Indebtedness in full, over an objection of the DIP Lender; (c) obtain or negotiate the terms of indebtedness other than the Post-Petition Indebtedness; (d) prosecute any claim or action, the primary purpose of which is to invalidate, set aside avoid or subordinate, in whole or in part, the Post-Petition Indebtedness or the DIP Lender's security interests in the DIP Collateral; (e) object to, contest or raise any defense to the validity, perfection, priority, extent or enforceability of the Pre-Petition Indebtedness or the Post-Petition Indebtedness or DIP Lender's security interests in the Bridge Loan Collateral or the DIP Collateral; or (f) assert any claims, counterclaims, defenses or causes of action against the DIP Lender or its affiliates.

12.     In the event of the occurrence of any of the following: (a) the failure of the Debtors to perform in any material respect any of their obligations pursuant to this Interim Order, including, without limitation, payments to the DIP Lender contemplated in the Budget or in this Interim

Order, (b) conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (c) the appointment of a trustee, pursuant to section 1104(a)(1) of the Bankruptcy Code, or pursuant to section 1104(a)(2) of the Bankruptcy Code, without the prior written consent of the DIP Lender, (d) dismissal of the Chapter 11 Case, (e) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending this Interim Order without the express prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender), (f) the filing of a plan of reorganization by any party in interest which does not provide for the full and indefeasible payment of the Post-Petition Indebtedness or Obligations to the DIP Lender upon confirmation; (g) the Debtors filing or the Court entering a further order (other than the Final Order) granting, without the prior written consent of the DIP Lender, of (i) a motion for the use of cash collateral of the DIP Lender, (ii) a motion requesting authority to incur indebtedness either (A) having administrative expense priority equal or superior to the administrative expense priority granted to the DIP Lender under this Interim Order with respect to the DIP Lender's claims other than debt incurred in the ordinary course of business, or (B) secured by a security interest or lien with priority equal or superior to the priority of DIP Lender's' security interests in or liens on the DIP Collateral; (h) the Debtors filing, or the Court entering any order granting, a motion or application to (xx) revoke, reverse, stay the implementation of, modify, supplement or amend this Interim Order or (xxx) invalidate, raise defenses to, or otherwise challenge the extent, amount, validity, perfection, priority or enforceability of the security interests and liens of DIP Lender in the Post-Petition Collateral; and (i) the occurrence of a material default or material event of default by the Debtors under the DIP Loan Documents (each of the foregoing events being referred to in this Interim Order as an "Event of Default") and, collectively, as "Events of Default". If an Event of Default occurs, the DIP Lender

may provide written notice thereof (a "Default Notice") to counsel for the Debtors, counsel for the official committee of unsecured creditors (if one is formed), and counsel for the Bankruptcy Administrator (collectively, the "Notice Parties") and may cease making any further advances under this Interim Order. The Debtors shall have seven (7) days (or such longer period as the Court may permit) following the Notice Parties' receipt of a Default Notice within which to cure any Event of Default identified in that Default Notice to DIP Lender's reasonable satisfaction, whereupon DIP Lender shall resume making further advances under this Interim Order. Without limiting the preceding sentence, (x) the Debtors and any other party in interest shall have the right, but not the obligation, to seek an expedited or emergency hearing before the Court for the purpose of challenging whether any Event of Default has occurred or, if an Event of Default has occurred, whether that Event of Default has been cured, and (y) DIP Lender shall have the right, but not the obligation, to seek an expedited or emergency hearing to seek relief from the automatic stay in order to (I) terminate the Post-Petition Financing (the date of any such termination, the "Termination Date") and declare the Post-Petition Indebtedness to be immediately due and payable, (II) require the Debtors to immediately segregate and not use any cash collateral or funds without further order of this Court, (III) setoff amounts in any accounts maintained with the DIP Lender, or otherwise enforce rights against all or part of any Post-Petition Collateral in the possession of the DIP Lender; and/or (IV) take any other action or exercise any other right or remedy of the DIP Lender under this Interim Order or by operation of law. The Court shall shorten notice periods to accommodate any such expedited or emergency hearing. Upon the Debtors' receipt of a Default Notice from the DIP Lender, the Debtors shall immediately cease making any disbursements pursuant to the Budget or otherwise without further order of this Court; provided, however, that the obligations and rights of the DIP Lender and the Debtors with respect to all

transactions which have occurred prior to the Termination Date shall remain unimpaired and unaffected by any such termination and shall survive such termination; and provided further that upon such termination the DIP Lender shall be deemed to have retained all of its rights and remedies, including, without limitation, as provided under the Bankruptcy Code.

13.    MidCap is hereby granted relief from the automatic stay to allow MidCap to apply the proceeds of the Debtors' pre-petition accounts receivable generated prior to March 10, 2025 to the MidCap Indebtedness.

14.    If applicable, the DIP Lender is hereby granted relief from the automatic stay to allow the DIP Lender to apply the proceeds of accounts receivable and the DIP Collateral to the Post-Petition Indebtedness.

15.    As soon as practical after the entry of this Interim Order, the Debtors shall account to the DIP Lender for all cash, checks, notes, drafts, instruments, acceptances or other property representing cash or other proceeds of the DIP Collateral in the Debtors' possession, custody or control. All cash, checks, notes, drafts, instruments, acceptances and other property in the nature of items of payment representing proceeds of property and interests in property of the Debtors (collectively, the "Cash Proceeds") currently in the possession of the Debtors or in any accounts in financial institutions, including any lock box or depository accounts, shall be deemed proceeds of the DIP Collateral.

16.    The agreement by the DIP Lender to make any DIP Financing available to the Debtors pursuant to the terms of this Interim Order, the Financing Agreement and the DIP Loan Documents shall continue until the earlier of (a) the date all Post-Petition Indebtedness is repaid in full by the Debtors and (b) 150 days after entry of this Interim Order (the "Term"), unless

terminated prior to the expiration of the Term pursuant to this Interim Order  or further order of
the Court.

17.    The Debtors are hereby required to deliver to the DIP Lender such other financial
and other information concerning the business and affairs of the Debtors as the DIP Lender shall
reasonably request from time to time, including, without limitation, all material documents relating
to any proposed sale or restructuring (including without limitation, solicitation materials,
disclosure statements, solicitation for new financing, valuations, business plans, sale materials and
projections) provided to third parties at such time as such documents and information are provided
to such third parties, as well as such other information reasonably requested by DIP Lender,
provided further, however, that if the DIP Lender or its affiliate become a bidder for the assets of
the Debtors, the Debtors are not obligated to disclose the names of the third parties to the DIP
Lender.   The Debtors shall further provide the DIP Lender upon request, with (a) detailed
information as to the extent and composition of the DIP Collateral and any collections thereon; (b)
a weekly report, with information reasonably satisfactory to the DIP Lender, identifying and
differentiating accounts receivable; (c) a weekly revenue report (including reports of sales); and
(d) a weekly variance report of actual expenditures versus Budget expenditures.

18.    Having been found to be extending credit and making loans to the Debtors in good
faith, the DIP Lender shall be entitled to the full protection of section 364(e) of the Bankruptcy
Code with respect to the DIP Financing and the liens and priorities created or authorized by this
Interim Order in the event that this Interim Order or any authorization contained herein is stayed,
vacated, reversed or modified on appeal. Any stay, modification, reversal or vacation of this
Interim Order shall not affect the validity of any obligation of the Debtors to the DIP Lender
incurred pursuant to this Interim Order. Notwithstanding any such stay, modification, reversal or

vacation, all loans made pursuant to this Interim Order, all use of cash collateral and all DIP Financing incurred by the Debtors pursuant hereto prior to written notice to the DIP Lender of the effective date of any such stay, modification, reversal or vacation, shall be governed in all respects by the provisions hereof and the DIP Lender shall be entitled to all the rights, privileges and benefits of this Interim Order, including without limitation, the liens and Superpriority Claims granted herein to the DIP Lender.

19.     The transactions contemplated by the DIP Financing are not intended to provide the DIP Lender with sufficient control over the Debtors so as to subject the DIP Lender to any liability in connection with the management of the Debtors' business or any of the Debtors' properties. By providing the DIP Financing or taking any actions pursuant to this Interim Order, the DIP Lender shall not: (1) be deemed to be in control of the operations or liquidation of the Debtors; or (2) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation, management or liquidation of the Debtors.

20.     The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered including without limitation (a) converting this Chapter 11 Case to chapter 7; or (b) dismissing the Chapter 11 Case and the terms and provisions of this Interim Order and the DIP Financing Agreement, as well as the Superpriority Claims and liens granted pursuant to this Interim Order and the DIP Financing Agreement shall continue in full force and effect notwithstanding the entry of such order or orders, and such Superpriority Claims and liens shall maintain their priority as provided by this Interim Order until all Post-Petition Indebtedness is indefeasibly paid in full and discharged by the Debtors.

21.     The Debtors must provide the DIP Lender evidence that the DIP Collateral is insured for the full replacement value thereof and the DIP Lender is named as loss payee and/or as additional insured on all insurance policies upon request of the DIP Lender.

22.     The DIP Lender is entitled to a waiver of the provisions of section 506(c).

23.     In consideration for the DIP Financing, the Debtors on behalf of themselves and their successors, assigns and their estates, as well as each of their officers, directors and shareholders (collectively, the "Releasors"), shall forever release, discharge and acquit the DIP Lender and its respective officers, directors, employees, agents, attorneys and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, damages, liabilities, responsibilities, disputes, remedies, actions, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" claims or defenses, which arose on or prior to the Petition Date.

24.     Entry of this Interim Order shall be without prejudice to any and all rights, remedies, claims and causes of action which the DIP Lender may have against the Debtors or any third parties, and without prejudice to the right of the DIP Lender to seek further relief from the automatic stay in effect pursuant to section 362 of the Bankruptcy Code, or any other relief in this Chapter 11 Case, and the right of the Debtors and other parties in interest to oppose any such relief by contesting the existence of an Event of Default (or asserting that an Event of Default has been cured) and as otherwise consistent with the terms of this Interim Order. The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender and its successors and assigns, the Debtors and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in this Chapter 11 Case as a legal representative of the Debtors or their respective estates.

25.     The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements as the DIP Lender may reasonably require, as evidence of and for the protection of the DIP Financing, or which otherwise may be deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of this Interim Order.

26.     The terms of this Interim Order shall be valid and binding upon the Debtors and all of the respective creditors of the Debtors, and all other parties in interest from and after the date of this Interim Order. In the event this Court modifies any of the provisions of this Interim Order following such further hearing, such modifications shall not affect the rights and priorities of the DIP Lender pursuant to this Interim Order with respect to the DIP Collateral and any portion of the DIP Financing which arises, or is incurred or is advanced prior to such modifications (or otherwise arising prior to such modifications), and this Interim Order shall remain in full force and effect except as specifically amended or modified at such final hearing.

27.     Any creditor or other interested party in interest having any objection to this Interim Order shall file with the Clerk of this Court, and serve upon (a) counsel for the Debtors, (b) counsel an official committee of unsecured creditors (if one is formed), (c) counsel for the DIP Lender, (d) the Office of the Bankruptcy Administrator, and (e) any party in interest that has filed a notice of appearance in this Chapter 11 Case, on or before _____ at __:00 a.m./p.m., a written objection and shall appear to advocate said objection at the final hearing to be held at _____ a.m./p.m. on the _____ day of _____, 2025 in Courtroom ___ of the United States Bankruptcy Court for the Eastern District of North Carolina. In the event no objections are filed, or if any such objections are not advocated at such hearing, then this Interim Order shall continue in full force and effect and shall be deemed a Final Order without further

notice or hearing in accordance with Rule 4001(d)(3) of the Federal Rules of Bankruptcy Procedure.

28.     The Debtors shall serve a copy of this Interim Order (a) by overnight delivery, email, the Court's ECF system, or facsimile within three (3) business days after entry of this Interim Order on (i) counsel for the DIP Lender; (ii) an official committee of unsecured creditors (if one is formed) or its counsel; and (iii) the office of the  United States Bankruptcy Administrator's Office.

29.     Any finding of fact set forth in this Interim Order that is a conclusion of law will be deemed to be a conclusion of law incorporated by reference in these conclusions of law as though fully set forth herein.

**END OF DOCUMENT**

**EXHIBIT B**

## DEBTOR-IN-POSSESSION FINANCING AGREEMENT

THIS DEBTOR-IN-POSSESSION FINANCING AGREEMENT (this "Agreement"), dated as of May __, 2025, is entered into by and between **STAFFING 360 SOLUTIONS, INC., MONROE STAFFING SERVICES, LLC, LIGHTHOUSE PLACEMENT SERVICES, INC., HEADWAY WORKFORCE SOLUTIONS, INC., and KEY RESOURCE, INC.** (collectively, the "Borrowers"), and **NOOR STRATEGIES, INC.** ("Lender").

1.    **Recitals**.

    1.1    On May 5, 2025 (the "Petition Date"), the Borrowers filed for chapter 11 bankruptcy protection under 11 U.S.C. Section 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of North Carolina (the "Bankruptcy Court"), the Debtors have filed a motion seeking to administratively consolidate the Borrowers at Case No. 2525-01682-5-JNC (collectively, the "Bankruptcy Case"[1]).

    1.2    Prior to the filing of the Bankruptcy Case, Lender's affiliate, Noor Staffing Group, LLC ("Noor") provided financing (the "Bridge Loan") to Borrowers pursuant to that certain Revolving Loan Promissory Note effective as of February 23, 2025 in the maximum principal amount of $4,000,000, Continuing Security Agreement effective as of February 23, 2025 and all documents executed in connection therewith (collectively, the "Bridge Loan Documents").

    1.3    The Debtors' obligations arising under, or in connection with, the Bridge Loan Documents are secured by a lien in all of the Debtors' accounts receivables related to those certain "360 Contracts" as of March 10, 2025 (collectively, the "Accounts").  Noor's liens in the Accounts were perfected by the filing of Uniform Commercial Code Financing Statements. As of the Petition Date, the outstanding principal amount under the Bridge Loan is approximately $766,000.

    1.4    On or about March 19, 2025, the Debtors, MidCap Funding IV Trust ("MidCap") and Noor entered into a Memorandum of Understanding ("MOU") whereby Noor agreed to, inter alia, to advance the certain funds to the Debtors to employ and cover the costs and expense of the Debtors' employees and other mutually agreed upon operational costs (the "Operating Funds"). Under the MOU, MidCap agreed to reimburse Noor for Operating Funds in the approximate amount of $2,744,900 (the "Reimbursement Obligations").

    1.5    Noor and the Debtor are also parties to that certain Administrative Services Agreement ("ASA") effective as of February 23, 2025 whereby Noor agreed to perform certain services for the Debtors, as more particularly set forth in the ASA. In order to perform the Services, Noor lent money to the Debtors and/or paid certain

---

[1] The Debtors and their respective case numbers are as follows: Staffing 360 Solutions, Inc. 25-01684-5-JNC, Monroe Staffing Services, LLC 25-01686-5-JNC, Lighthouse Placement Services, Inc. 25-01687-5-JNC, Headway Workforce Solutions, Inc. 25-01682-5-JNC, and Key Resource, Inc. 25-01685-5-JNC.

costs and expenses on the Debtors' behalf. All funds advanced or otherwise loaned to the Debtors in accordance with the ASA or the MOU make up the amounts due pursuant to the Bridge Loan Documents

1.6    Lender has agreed to provide post-petition debtor-in-possession financing (the "DIP Loan") to Borrowers as more fully set forth herein and in the Financing Orders which orders shall be in form and substance acceptable to Lender in its sole and unfettered discretion, to be used to retire the Bridge Loan, and to pay the expenses of Borrowers during the Bankruptcy Case and other expenses described more fully herein and in the Operating Budget (as defined below).

1.7    In consideration of the DIP Loan, Borrowers shall request that the Bankruptcy Court enter the Financing Orders granting Lender, among other things, a priming lien and super-priority administrative expense status, pursuant to Bankruptcy Code Section 364, in all of Borrowers' assets[2].

2.    **Definitions**.  Capitalized terms used herein and not otherwise defined herein will have the meanings given those terms in Section 15 of this Agreement.

3.    **Interim Facility; DIP Loan; Fees**.

3.1    Interim Facility.  Subject to the terms and conditions set forth in this Agreement and the Interim Order, after the entry of the Interim Order, Lender will make available to Borrowers a non-revolving draw facility in the amount of the Bridge Loan as of the Petition Date plus all amounts required pursuant to the Operating Budget during the interim period in the approximate maximum amount of $366,000 (the "Interim Facility") until the earlier of (a) the entry of the Final Order or (b) the Termination Date.  If a Final Order is not entered or upon the Termination Date, all amounts outstanding under the Interim Facility shall be immediately due and payable to Lender in full.

3.2    DIP Loan.  After entry of the Final Order, Lender will make available to Borrowers a non-revolving credit facility of up to $1,130,000 (the "DIP Loan") inclusive of any sums outstanding under the Interim Facility on such date, subject to the terms and conditions and made upon the representations and warranties of Borrowers set forth in this Agreement and the Final Order.

3.3    Interest; Payments.  Subject to the applicability of the Default Rate (as defined below), amounts advanced and outstanding under the Interim Facility and/or the DIP Loan shall bear interest at a rate per annum (based on a year of 360 days for the actual number of days in each interest period) of sixteen percent (16%), but not more than the maximum interest rate permitted by applicable law. Lender shall defer the payment of accrued interest any other amounts due pursuant to the DIP Loan until the earlier to occur of (i) the date of an Event of Default (as defined

---

[2] The priming lien shall be subject to the Carve-Out and the pre-petition lien of Midcap in the Debtors' accounts receivable generated prior to March 10, 2025.

below); (ii) the date of the approval by the Bankruptcy Court of a sale of substantially all of the assets of the Borrowers, (iii) the effective date of a plan of reorganization of Borrowers in the Bankruptcy Case; or (iv) the Termination Date. Payments received will be applied to (1) charges, fees and expenses (including reasonable attorneys' fees), (2) accrued interest and (3) principal, in the order determined by Lender. The outstanding principal balance of the DIP Loan, all accrued and unpaid interest thereon, and all related fees and expenses will be due and payable in full on the Termination Date.

3.4     Roll-Up.  Subject to Bankruptcy Court approval of this Agreement, and except as otherwise ordered by the Bankruptcy Court, that portion of the Interim Facility equal to the outstanding principal balance and accrued interest due under the Bridge Loan shall be used solely to pay in full the Bridge Loan.

**4.     Advances Under DIP Loan**.

4.1     Lender agrees that, promptly after entry of the Interim Order by the Bankruptcy Court, Lender will advance funds under this Agreement to pay in full the Bridge Loan.  Thereafter, Borrowers may make requests to Lender for additional advances under the DIP Loan, pursuant to such request forms or other documentation as Lender may reasonably require.  On the terms and subject to the conditions of this Agreement and the Financing Orders, Lender will make such advances within three (3) business days after request by Borrowers.  Amounts borrowed under the DIP Loan and repaid to Lender may not be reborrowed.  Borrowers will execute and deliver to Lender such additional documents and instruments as Lender may reasonably require to evidence the DIP Loan.

4.2     The funds available under the DIP Loan after payment of the Bridge Loan, and after first exhausting available cash flow from the operations of Borrowers, shall be disbursed as follows, in the following order of priority unless otherwise agreed by Lender:

4.2.1   for the operation of the business of Borrowers during the administration of the Bankruptcy Case pursuant to the Operating Budget;

4.2.2   after appropriate Bankruptcy Court approval, for the payment of the Allowed Administrative Claims of Professionals (as defined below) pursuant to the Operating Budget and Section 6 of this Agreement;

4.2.3   subject to the Operating Budget, to any other Persons which have pre-petition claims that the Bankruptcy Court authorizes Borrowers to pay; and

4.2.4   for the payment of other creditors as required by the Bankruptcy Court and as provided in the Operating Budget.

4.3     In no event shall Lender be under any obligation to advance funds under the DIP Loan if (i) the request for funds under the DIP Loan is for a purpose and/or an amount not provided in the Operating Budget or is otherwise not in strict

3

compliance with the Operating Budget and the Financing Orders, (ii) Lender shall fail for any reason to have a superpriority lien, pursuant to Bankruptcy Code Section 364, in substantially all the assets of Borrower, (ii) Lender's lien on the assets of Borrowers for any reason ceases to be or is not a valid and perfected lien having a first priority interest, (iii) any Default or Event of Default shall have occurred and be continuing or (iv) after giving effect to such advance, the outstanding balance of the DIP Loan would exceed $1,130,000.

5. **DIP Collateral**. Subject to entry of the Financing Orders by the Bankruptcy Court, security for the repayment of the DIP Loan and all other indebtedness, liabilities and obligations now or hereafter owing by Borrowers to Lender of every kind and description will include, but not be limited to, the following (collectively, the "DIP Collateral"):

    5.1    Subject only to the Carve-Out and the pre-petition lien of Midcap in the Debtors' accounts receivable generated prior to March 10, 2025, a super-priority and first lien, pursuant to Bankruptcy Code Section 364, on all of the Debtors personal property, including accounts, inventory, equipment, general intangibles and other assets of Borrowers pursuant to the Financing Orders and the pre-petition continuing Security Agreement between Borrowers and Lender;

    5.2    Subject only to the Carve-Out and the pre-petition lien of Midcap in the Debtors' accounts receivable generated prior to March 10, 2025, a super-priority and first lien on all other property of Borrowers that serves as security pursuant to any other provision of this Agreement or any of the Financing Orders;

    5.3    Subject only to the Carve-Out, a super-priority and first lien on all claims for, and recoveries arising from, avoidable transfers under the Bankruptcy Code, including, without limitation, transfers avoidable and/or recoverable under Sections 510, 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code (the "Avoidance Claims"); and

    5.4    Subject to the Carve-Out, the DIP Loan shall be entitled to superpriority administrative expense claim status, with priority over any and all administrative expense claims (the "Superpriority Claims").

Subject to Bankruptcy Court approval in the Financing Orders, Lender's lien and security interest shall be deemed to be a duly perfected, non-voidable, first priority lien on and security interest in the DIP Collateral, subject only to the Carve-Out and Subject only to the Carve-Out and the pre-petition lien of Midcap in the Debtors' accounts receivable generated prior to March 10, 2025. Although no documentation will be required to perfect the lien and security interest, Borrowers will provide any documentation reasonably requested by Lender in order to evidence or perfect Lender's lien and security interest in the DIP Collateral. Also, subject to Bankruptcy Court approval in the Financing Orders, the lien and security interest in favor of Lender shall remain in full force and effect no matter the result of the Bankruptcy Case including, but not limited to, a dismissal of the Bankruptcy Case or a conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

6. **Professional Fees**.   Lender agrees that some of the funds loaned pursuant to this Agreement and the proceeds of the DIP Collateral may be used to pay the Allowed Administrative Claims professionals retained by Borrowers in connection with the Bankruptcy Case (the "Professionals"), which retention has been approved by the Bankruptcy Court, provided all terms of this Agreement are fulfilled.  Borrowers may include in the Operating Budget a line item for the fees of Professionals.  Borrowers may pay to each Professional fees as permitted under Section 331 of the Bankruptcy Code, the local rules of the Bankruptcy Court, and any Order Establishing Interim Compensation Procedures.  After entry of a final order by the Bankruptcy Court approving the payment of fees, any remaining sums from Borrowers held by a Professional after payment of all approved fees due to such Professional or disgorged by such Professional shall be promptly paid over to Lender, said funds at all times remaining subject to Lender's liens and security interests.

7. **Representations and Warranties**.  To induce Lender to enter into this Agreement and to make the advances herein contemplated, Borrowers hereby represent and warrant as follows:

    7.1   **Organization**.  Borrowers are corporations duly organized and in good standing under the laws of the States of North Carolina, Delaware and New York and are duly qualified in all jurisdictions where required by the conduct of their businesses or the ownership of their assets except where the failure to do so qualify would not have a material adverse effect on their condition, financial or otherwise, and have the power and authority to own and operate their assets and to conduct their business as is now done.[3]

    7.2   **Recent Actions**.  Other than the filing of the Bankruptcy Case, and except as disclosed in the Bankruptcy Schedules, Borrowers have not since prior to the Petition Date:  (a) incurred any obligations or liabilities, whether accrued, absolute, contingent or otherwise, other than liabilities incurred and obligations under contracts entered into in the ordinary course of business and other than liabilities to Lender; (b) discharged or satisfied any lien or encumbrance or paid any obligations, absolute or contingent, other than current liabilities, in the ordinary course of business; (c) mortgaged, pledged or subjected to lien or any other encumbrance any of their assets, tangible or intangible, or cancelled any debts or claims except in the ordinary course of business; or (d) made any loans or otherwise conducted their businesses other than in the ordinary course.

    7.3   **Title**.  Borrowers have good and marketable title to the assets reflected on their most recent financial statements delivered to Lender, free and clear from all liens and encumbrances except for: (a) current taxes and assessments not yet due and payable, (b) liens and encumbrances, if any, reflected or noted on such financial statements and the Bankruptcy schedules, (c) any security interests, pledges or

---

[3] Need organization information from the debtors to complete this paragraph

mortgages to Lender, and (d) assets disposed of in the ordinary course of Borrowers' business.

**7.4**    **Litigation, etc**.  Other than the filing of the Bankruptcy Case, and except as disclosed in the Bankruptcy Schedules, there are no actions, suits, proceedings or governmental investigations pending or, to their knowledge, threatened against Borrowers which, if adversely determined, could result in a material and adverse change in Borrowers' financial condition, business or assets; and there is no basis known to Borrowers for any such action, suit, proceeding or investigation.

**7.5**    **Taxes**.  Except as to taxes not yet due and payable, Borrowers have filed all returns and reports that are now required to be filed by it in connection with any federal, state or local tax, duty or charge levied, assessed or imposed upon it or their property, including unemployment, social security and similar taxes; and all of such taxes have been either paid or adequate reserve or other provision has been made therefor.

**7.6**    **Authority**.  Upon entry of the Interim Order (or the Final Order, as applicable) by the Bankruptcy Court, Borrowers have full power and authority to enter into the transactions provided for in this Agreement.  The documents to be executed by Borrowers in connection with this Agreement, when executed and delivered by Borrowers will constitute, upon entry of the Interim Order (or the Final Order, as applicable) by the Bankruptcy Court, the legal, valid and binding obligations of Borrowers enforceable in accordance with their respective terms except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium or similar laws in effect from time to time affecting the rights of creditors generally and except as such enforceability may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in law or in equity).

**7.7**    **Licenses, etc**.  Borrowers have obtained any and all licenses, permits, franchises or other governmental authorizations necessary for the ownership of their properties and the conduct of their business.  Borrowers possess adequate licenses, patents, patent applications, copyrights, trademarks, trademark applications, and trade names to continue to conduct their businesses as heretofore conducted by Borrowers, without any conflict with the rights of any other Person.

**7.8**    **Name, Places of Business and Location of Collateral**.  The address of Borrowers' principal place of business and every other place from which it conducts business is as specified in the Bankruptcy Schedules. The Collateral and all books and records pertaining to the Collateral are and will be located at the addresses indicated on the Bankruptcy Schedules. In the five years preceding the date hereof, Borrowers have not conducted business under any name other than their current names nor maintained any place of business or any assets in any jurisdiction other than those disclosed on the Bankruptcy Schedules.

**7.9**  **ERISA**.  All "employee welfare benefit" and "employee pension benefit" plans (as defined in Section 3(1) and 3(2), respectively, of the Employee Retirement Income Security Act of 1974, as amended and in effect ("ERISA")), established or maintained by Borrowers or any of their Affiliates (collectively, "Employee Benefit Plans") meet the minimum funding standards of Section 302 of ERISA and 412 of the Internal Revenue Code where applicable, and each Employee Benefit Plan that is intended to be qualified within the meaning of Section 401 of the Internal Revenue Code of 1986 is qualified. No withdrawal liability has been incurred under any Employee Benefit Plan and no "reportable event" or "prohibited transaction" (as such terms are defined in ERISA), has occurred with respect to any Employee Benefit Plan.  Borrowers have paid and discharged all obligations and liabilities arising under the ERISA.

**7.10**  **Environmental Matters.**  Borrowers have not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Substances, on or off any of the premises of the Borrowers (whether or not owned by it) in any manner which at any time violates any Environmental Law or any license, permit, certificate, approval or similar authorization thereunder.  Borrowers will comply in all material respects with all Environmental Laws and will obtain all licenses, permits certificates, approvals and similar authorizations thereunder. There has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any governmental authority or any other Person, nor is any pending or, to the best of Borrowers' knowledge, threatened, and the Borrowers immediately shall notify Lender upon becoming aware of any such investigation, proceeding, complaint, order, directive, claim, citation or notice, and shall take prompt and appropriate actions to respond thereto, with respect to any non-compliance with, or violation of, the requirements of any Environmental Law by Borrowers or any of their Affiliates, or the release, spill or discharge of any Hazardous Material or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Material or any other environmental, health or safety matter, which affects Borrowers or their businesses, operations or assets or any properties at which Borrowers have transported, stored or disposed of any Hazardous Substances.  Borrowers have no material liability (contingent or otherwise) in connection with a release, spill or discharge of any Hazardous Substances or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Material. Borrowers further agree to allow Lender or its agent access to the properties of the Borrowers and its Affiliates to confirm compliance with all Environmental Laws, and Borrowers shall, following determination by Lender that there is non-compliance, or any condition which requires any action by or on behalf of Borrowers in order to avoid any non-compliance, with any Environmental Law, at Borrowers' sole expense, cause an independent environmental engineer acceptable to Lender to conduct such tests of the relevant site as are appropriate, and prepare and deliver a report setting forth the result of such tests, a proposed plan for remediation and an estimate of the costs thereof.

**7.11** **Labor Matters**. There are no material strikes or other material labor disputes against Borrowers pending or, to their knowledge, threatened. The hours worked and payment made to their employees in all material respects have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters. All payments due from Borrowers, or for which any claim may be made against it, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on their books. The consummation of the transactions contemplated herein will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Borrowers are a party or by which it is bound.

**8.**     **Affirmative Covenants**.  From the date of execution of this Agreement until all of the DIP Loan has been fully paid, Borrowers will:

**8.1**   **Operating Budget**.  Operate their businesses (including without limitation meeting their projections for sales and revenue, collecting their receivables, and selling their inventory) only in accordance with the operating budget approved by Lender (the "Operating Budget"). The Operating Budget for the period through June 27, 2025 is attached hereto as Exhibit A and has been approved by Lender.  Each Operating Budget will be a four week budget (in format and detail comparable to the budget attached as Exhibit A to this Agreement) showing each of the following on a line item basis:  (a) budgeted cash receipts (including as a result of the receipt of proceeds from the DIP Loan) and (b) anticipated disbursements during the applicable period.  Revisions to the Operating Budget may be approved by Lender in its sole discretion.

**8.2**   **Cash Flow Forecasts**.  Furnish to Lender by Wednesday of each week, (i) a rolling thirteen week cash flow forecast for the Borrowers in reasonable detail and in a form reasonably acceptable to Lender and (ii) a report, in a form reasonably acceptable to Lender, comparing Borrowers' actual cash flow for the prior week to the cash flow forecast for such week set forth in the Operating Budget.

**8.3**   **Budget Reconciliation**.  Furnish to Lender (a) by Wednesday of each week, a reconciliation of projected versus actual receipts and disbursements for the period covered by the immediately preceding Operating Budget; (b) not later than the last Business Day of the third week of the period covered by the then-current Operating Budget, an Operating Budget for the immediately following four-week period. Borrowers may submit for approval by Lender a modified Operating Budget for any period so long as any such modified Operating Budget is submitted by the end of the third week of the then operative Operating Budget.

**8.4**   **Books and Records; Access**.  Maintain proper books of account and other records and enter therein complete and accurate entries and records of all of Borrowers' transactions and give representatives of Lender access thereto at all reasonable times, including permission to examine, copy and make abstracts from any of books and records, forecasts, financial models, financial statements, and such other information as Lender may from time to time reasonably request.  Borrowers will

give Lender access to the DIP Collateral for the purposes of examining the DIP Collateral and verifying its existence and condition. Borrowers will make available to Lender upon request copies of any reports, statements or returns which Borrowers may make to or file with any governmental department, bureau or agency, federal or state. In addition, Borrowers will cause their directors, officers, consultants and agents to be available to Lender from time to time upon reasonable notice to discuss the status of the DIP Loan, Borrowers' business and any statements, records or documents furnished or made available to Lender in connection with this Agreement.

8.5     **Taxes**. From and after the Filing Date, Borrowers shall pay and discharge when due all indebtedness and all taxes, assessments, charges, levies and other liabilities imposed upon them, their income, profits, property or business, except those which currently are being contested in good faith by appropriate proceedings and for which it has set aside adequate reserves or made other adequate provision with respect thereto, but any such disputed item will be paid forthwith upon the commencement of any proceeding for the foreclosure of any lien which may have attached with respect thereto, unless Lender has received an opinion in form and substance and from legal counsel acceptable to Lender that such proceeding is without merit.

8.6     **Operations**. Continue Borrowers' business operations in substantially the same manner as at present except where such operations are rendered impossible by a fire, strike or other events beyond their control; and Borrowers will keep their real and personal properties in good operating condition and repair; make all necessary and proper repairs, renewals, replacements, additions and improvements thereto and comply with the provisions of all leases to which it is party or under which it occupies or holds real or personal property so as to prevent any loss or forfeiture thereof or thereunder.

8.7     **Insurance**. Keep Borrowers' insurable real and personal property insured with responsible insurance companies against loss or damage by fire, windstorm and other hazards which are commonly insured against in an extended coverage endorsement in an amount equal to not less than 100% of the insurable value thereof on a replacement cost basis and also maintain public liability insurance in a reasonable amount. In addition, Borrowers will maintain extended liability insurance and property insurance of at least the amounts and coverages listed on such certificates and in a form and with companies satisfactory to Lender. Notwithstanding the foregoing, such property insurance will at all times be in an amount so that such party will not be deemed a "co-insurer" under any co-insurance provisions of such policies. All such insurance policies will be endorsed to include Lender as an additional insured and, where applicable, to name Lender as lender's loss payee under a loss payable endorsement satisfactory to Lender. All such policies will provide that thirty (30) days prior written notice must be given to Lender before such policy is altered or cancelled. Schedules of all insurance will be submitted to Lender upon request. Such schedules will contain a description of the risks covered, the amounts of insurance carried on each risk, the name of the

insurer and the cost of such insurance. Such schedules will be supplemented from time to time promptly to reflect any change in insurance coverage.

8.8    **Compliance with Laws**. Comply in all material respects with all laws applicable to Borrowers and their business (including without limitation any statute, rule or regulation relating to employment practices and pension benefits or to environmental, occupational and health standards and controls) and do all things necessary to maintain, renew and keep in full force and effect their corporate existence and all rights, permits and franchises necessary to enable it to continue its business.

8.9    **Notice of Default**. Notify Lender in writing within two (2) business days after Borrowers know or has reason to know of the occurrence of an Event of Default.

8.10    **Financial and Other Information**. Furnish Lender promptly after Lender's request with such financial information and other information regarding Borrowers or their Affiliates as Lender may reasonably request. All such information will be in reasonable detail and in a form reasonably satisfactory to Lender.

8.11    **Bankruptcy Case Information**. Promptly from time to time, deliver to Lender and its legal counsel copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Borrowers with the Bankruptcy Court or distributed by Borrowers to any official committee appointed in the Bankruptcy Case.

9.    **Negative Covenants**. From the date of execution of this Agreement until all of the DIP Loan has been fully paid, Borrowers will not without Lender's prior written consent:

9.1    **Debt**. Incur any additional Indebtedness other than: (a) the DIP Loan and any subsequent indebtedness to Lender; (b) open account obligations incurred in the ordinary course of business having maturities of less than 90 days; and (c) any indebtedness approved by the Bankruptcy Court and by Lender.

9.2    **Liens**. Incur, create, assume, become or be liable in any way, or suffer to exist any new mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of Borrowers' assets, now or hereafter owned, other than liens in favor of Lender.

9.3    **Rejection, Assumption of Executory Contracts**. Do any of the following: (a) assume any operating lease entered into prior to the Filing Date or (b) without first obtaining Lender's written consent, (i) reject any material unexpired lease or executory contract or (ii) assume or apply to the Bankruptcy Court to assume any material executory contract or unexpired lease (other than an operating lease) entered into prior to the Filing Date, unless, in the case of any unexpired lease, the order (which shall be in a form acceptable to Lender) authorizing such assumption specifically provides that, notwithstanding such assumption, Borrowers may later assign the relevant lease under Section 365(f) of the Bankruptcy Code without,

among other things, obtaining the applicable lessor's consent (but after complying with the other requirements of Section 365 of the Bankruptcy Code).

9.4 **Critical Vendor and Other Payments**.  Make (i) any pre-petition "critical vendor" payments or other payments on account of any creditor's pre-petition unsecured claims, (ii) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation claim or program or (iv) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and conditions that are (a) approved by order of the Bankruptcy Court and (b) expressly permitted by the Operating Budget.

9.5 **Guarantees**.  Guarantee, endorse or become contingently liable for the obligations of any Person, except in connection with the endorsement and deposit of checks in the ordinary course of business for collection.

9.6 **Merger, Acquisition or Sale of Assets**. Merge or consolidate with or into any Person or acquire all or substantially all the assets of any Person, or sell, lease or otherwise dispose of any of Borrowers' assets except for dispositions in the ordinary course of business or pursuant to an order of the Bankruptcy Court approving such sale.

9.7 **Advances and Loans**. Lend money, give credit or make advances (other than reasonable and ordinary advances to cover reasonable business-related expenses of employees, such as travel expenses) to any Person, including, without limitation, Affiliates.

9.8 **Subsidiaries**. Acquire any Subsidiaries, create any Subsidiaries or enter into any partnership or joint venture agreements.

9.9 **Transactions with Affiliates**. Enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate unless such transaction is otherwise permitted under this Agreement, is in the ordinary course of their businesses, and is on fair and reasonable terms no less favorable to Borrowers than Borrowers would obtain in a comparable arm's-length transaction with a non-Affiliate.

9.10 **Waivers**.  Waive any right or rights of substantial value which, singly or in the aggregate, is or are material to its condition (financial or other), properties or business.

9.11 **Line of Business**.  Enter into any lines or areas of business substantially different from the business or activities in which Borrowers are presently engaged.

9.12 **Ordinary Course**.  Take any action that is not in the ordinary course of Borrowers' business (as defined in Section 363 of the Bankruptcy Code) unless such action is approved by the Bankruptcy Court.

10. **Effective Date**.

    10.1   This Agreement will be effective (a) with respect to the Interim Facility, upon entry of the Interim Order and (b) with respect to the DIP Loan, when all of the conditions precedent have been met and upon entry of the Final Order.

    10.2   Upon the Termination Date, all of the DIP Loan obligations will become immediately due and payable in full without notice or demand. Recourse to the DIP Collateral or any other security will not be required at any time. Borrowers waive presentment and protest of any instrument and notice thereof, notice of default, and all other notices to which Borrowers might otherwise be entitled except such notices as are expressly provided herein or in the Interim Order.

    10.3   Notwithstanding any termination, until all of the DIP Loan obligations have been fully performed, paid and satisfied, Borrowers will remain liable for the full and prompt performance and payment of the DIP Loan and Lender will retain all of its rights and privileges hereunder, including, without limitation the retention of its interest in and to all of the DIP Collateral and other security for the DIP Loan.

11. **Events of Default**.  Each of the following shall constitute an "Event of Default" under this Agreement:

    11.1   <u>Non-Payment of DIP Loan, etc</u>. Default in the payment when due of the principal of the DIP Loan, or default in the payment when due of any interest, fee or other amount payable by Borrowers hereunder which default is continuing after five (5) days' notice thereof.

    11.2   <u>Non-Payment of Other Debt</u>. Except for defaults occasioned by the filing of the Bankruptcy Case and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits Borrowers from complying or permits Borrowers not to comply, a default or breach occurs under any agreement, document or instrument entered into either (x) pre-petition and which is assumed after the Filing Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code, or (y) post-petition, to which Borrowers are a party that is not cured within any applicable grace period therefor, and in either case such default or breach (i) involves the failure to make any payment when due in respect of any debt (other than the obligations of the Borrowers to Lender hereunder) of Borrowers in excess of $20,000 in the aggregate, or (ii) causes such debt to become due prior to its stated maturity or prior to its regularly scheduled dates of payment.

    11.3   <u>Other Material Obligations</u>. Default in the payment when due, or in the performance or observance of, any material obligation (including any tax obligation) of, the Borrowers (other than obligations of the Borrowers incurred prior to the Filing Date), except to the extent that the existence of any such default is being contested by Borrowers in good faith and by appropriate proceedings and appropriate reserves have been made in respect thereof or the results of such default

could not be reasonably expected to have a material adverse effect on Borrowers or their operations.

**11.4** <u>Non-Compliance with Covenants</u>. The default in the due observance of any covenant or agreement to be kept or performed by it under the terms of this Agreement, any of the Financing Orders, or any of the related documents and the failure or inability of it to cure such default within 15 days after the occurrence thereof; provided that such 15-day grace period will not apply to: (a) any default in any negative covenants that is not susceptible to cure, or (b) any failure to maintain insurance or to permit inspection of the DIP Collateral or of Borrowers' books and records.

**11.5** <u>Representations and Warranties</u>. Any representation or warranty made by Borrowers in this Agreement or in any report, certificate, opinion, financial statement or other document furnished in connection with this Agreement is intentionally or knowingly false or erroneous in any material respect.

**11.6** <u>Dismissal or Conversion of Bankruptcy Case</u>. The Bankruptcy Court shall enter an order with respect to Borrowers dismissing the Bankruptcy Case or converting it to a case under Chapter 7 of the Bankruptcy Code, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Borrowers' business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), and the order appointing such trustee, responsible officer or examiner shall not be stayed, reversed or vacated within five (5) days after the entry thereof.

**11.7** <u>Relief from Stay</u>. The Bankruptcy Court shall enter an order granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder of any claim against the Borrowers having an aggregate value (for all such claims) in excess of $50,000, which order enables the holder of such claim to exercise any right or remedy against the Borrowers or any property of Borrowers.

**11.8** <u>Modification of Financing Orders</u>. An order of the Bankruptcy Court shall be entered in the Bankruptcy Case amending or supplementing in a way that has a material negative impact on Lender's interests or staying for a period in excess of five (5) days, vacating or otherwise modifying any of the Financing Orders (including entry of an order terminating the use of cash collateral), or the Borrowers shall apply for authority to do so.

**11.9** <u>Contest of Claims</u>. Borrowers shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrowers) any other Person's opposition of, any motion made in the Bankruptcy Court by Lender seeking confirmation of the amount of Lender's claim or the validity and enforceability of the liens in favor of Lender (including the liens and security interests securing the Bridge Loan).

13

**11.10** <u>Disallowance of Claims</u>. Borrowers shall seek to, or shall support (in any such case by way of motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrowers) any other Person's motion to, disallow in whole or in part Lender's claim in respect of the Bridge Loan or to challenge the validity and enforceability of the liens and security interests in favor of Lender (including the liens and security interests securing the Bridge Loan).

**11.11** <u>Interim Order</u>. From and after the date of entry thereof, the Interim Order shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of five business (5) days, reversed, modified or amended), in each case without the consent of Lender, and the Final Order shall not have been entered prior to such cessation (or vacatur, stay, reversal, modification or amendment).

**11.12** <u>Final Order</u>. The Final Order shall not have been entered by the Bankruptcy Court within 30 days from the date of the entry of the Interim Order or, the Final Order shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of five business (5) days, reversed, modified or amended), in each case without the consent of Lender.

**11.13** <u>Payment of Debt</u>. Borrowers shall make any payment on any indebtedness of Borrowers incurred prior to the Filing Date, other than as permitted under the Financing Orders or as permitted hereunder and any payment of indebtedness approved by the Bankruptcy Court or with consent of Lender.

**11.14** <u>Failure to Comply with Financing Orders</u>. Borrowers shall fail to comply with the terms of the Financing Orders (including without limitation failure to achieve the milestones in the Financing Orders for confirming a plan of reorganization).

**11.15** <u>Judgments</u>. One or more final judgments which exceed an aggregate post-Filing Date liability of $50,000 shall be entered against Borrowers and shall not have been paid, discharged or vacated or had execution thereof stayed pending appeal within sixty (60) days after entry or filing of such judgments; or there shall be entered against Borrowers a non-monetary judgment, order or decree with respect to any claim or liability that accrued after the Filing Date which has or could be reasonably expected to have a material adverse effect on Borrowers or their operations, and there shall be any period of sixty (60) consecutive days during which a stay of enforcement of such judgment, decree or order, by reason of a pending appeal or otherwise, shall not be in effect.

**11.16** <u>Litigation</u>. The commencement of any action or proceeding against Lender by or on behalf of the Borrowers, or their chapter 11 bankruptcy estate, or any of their Affiliates, officers or employees.

**11.17** <u>Section 506(c) Claims</u>. The allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against Lender (including with respect to the Bridge

Loan) and the DIP Collateral or the "Collateral" (as defined in any of the documents executed in connection with the Bridge Loan).

**11.18**  Unacceptable Section 363 Sale. Borrowers shall enter into or purport to enter into an agreement pursuant to which the Borrowers would sell all or substantially all of their assets pursuant to Section 363 of the Bankruptcy Code, except pursuant to a sale order to which Lender has not objected.

**11.19**  Tax or Employee Claims. An order of the Bankruptcy Court shall be entered in the Bankruptcy Case allowing an administrative expense tax or employee claim in an amount greater than the amount set forth in the Operating Budget.

**11.20**  Superpriority. The entry of an order granting any other claim superpriority status or a lien equal or superior to that granted to Lender except for Allowed Administrative Claims as set forth herein.

**11.21**  Surcharge. The entry of an order authorizing recovery by any Person from the DIP Collateral or any collateral securing the Bridge Loan or any adequate protection liens granted with respect thereto for any costs of preservation or disposition thereof under Section 506(c) of the Bankruptcy Code or (except as provided in the Final Order) authorizing the use of cash collateral without Lender's prior written consent.

**11.22**  Impairment. The filing by or on behalf of the Borrowers of any motion or proceeding which could reasonably be expected to result in material impairment of Lender's rights under this Agreement; or a final determination by the Bankruptcy Court (or any other court of competent jurisdiction) with respect to any motion or proceeding brought by any other party which results in any material impairment of Lender's rights under this Agreement.

**11.23**  Extension of Exclusivity. The entry, without Lender's written consent which consent shall not be unreasonably withheld, of an order by the Bankruptcy Court extending any exclusive right that Borrowers may have to (i) propose any plan of reorganization in the Bankruptcy Case to a date more than one hundred and twenty (120) days after the Filing Date or such additional time as approved by the Court or (ii) solicit votes for or seek the confirmation of any plan of reorganization in the Bankruptcy Case to a date more than one hundred and eighty (180) days after the Filing Date or such additional time as approved by the Court.

**11.24**  Contested Plan. Borrowers, directly or indirectly, file, support or seek confirmation of any plan of reorganization that has not received the prior written approval of Lender.

If any Event of Default shall occur and be continuing, Lender may refuse to make further advances under the DIP Loan and, at Lender's option, its commitment to lend hereunder shall terminate. In addition, if any Event of Default shall occur and be continuing, the automatic stay under Section 362 of the Bankruptcy Code shall be deemed lifted, upon five (5) days written notice to Borrowers and the United States Trustee, without further order of or application to the Bankruptcy Court, to permit Lender to do one or more of the

15

following: (a) terminate Borrowers' use of cash collateral and cease to make any advances under the DIP Loan, (b) declare all indebtedness and other obligations of Borrowers to Lender to be immediately due and payable; (c) set off and apply to all or any part of the indebtedness or other obligations of Borrowers to Lender all moneys, credits and other property of any nature whatsoever of the Borrowers now or at any time hereafter in the possession of, in transit to or from, or under the control or custody of, Lender or any Affiliate of Lender, and otherwise enforce rights against the DIP Collateral in the possession of Lender for application towards the obligations of Borrowers to Lender; and (d) take any other action or exercise any other right or remedy permitted under this Agreement, the related security documents, the Financing Orders, or applicable law to effect the repayment and satisfaction of Borrowers' obligations to Lender. Upon the occurrence of any Event of Default, the outstanding principal balance of the DIP Loan, all accrued and unpaid interest thereon, and any additional amounts owing to Lender under this Agreement, will bear interest at a rate of nineteen percent (19%) per annum, but not more than the maximum rate permitted by applicable law (the "Default Rate"), from the date of such Event of Default. Borrowers waive any requirement of marshalling of the DIP Collateral upon the occurrence of any Event of Default.

12. **First Day Motions and Other Filings**. On the Filing Date, the Borrowers will file certain "first day" motions (the "First Day Motions"[4]), which First Day Motions shall be reasonably acceptable to Lender, and which may include: (i) a motion for expedited hearing on the First Day Motions, (ii) an application to engage **Bernstein Burkley, P.C.** as bankruptcy counsel to the Borrowers, (ii) a motion to extend the time to file bankruptcy schedules and statement of financial affairs, (iii) a motion establishing case management and noticing procedures in the Bankruptcy Case, (iv) a motion to incur post-petition financing pursuant to this Agreement, (v) a motion to pay pre-petition wages and other benefits, (vi) a motion to pay pre-petition taxes owing by Borrowers, and (vi) a motion to continue certain insurance policies. Lender and Borrowers agree to use their best efforts to obtain orders of the Bankruptcy Court approving the First Day Motions (including, but not limited to, the motion to incur post-petition financing), as expeditiously as possible under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

13. **Prepayments**.

13.1    Voluntary Prepayments. Borrowers may at any time prepay the outstanding balance of the DIP Loan in whole or in part without premium or penalty; provided that Borrowers shall give Lender written notice thereof at least one business day prior to the date of such prepayment, specifying the date and amount of the prepayment.

13.2    Mandatory Prepayments. Borrowers shall make a prepayment of the DIP Loan upon the occurrence of any of the following (each, a "Mandatory Prepayment Event") at the following times and in the following amounts:

13.2.1   Upon (i) the completion of any sale, lease or other transfer of any property or asset (other than in the ordinary course of business) of Borrowers or

---

[4] Any additional motions?

(ii) any receipt of payment in respect of any property or casualty insurance claim or any taking under power of eminent domain or by condemnation or similar proceeding of or relating to any property or asset of Borrowers, in an amount equal to 100% of the cash proceeds received with respect thereto, net of reasonable and customary closing expenses.

**13.2.2** If Borrowers' businesses shall generate funds in excess of the amount necessary to fund the Operating Budget, an amount equal to 100% of such excess funds.

A mandatory prepayment made as a result of a Mandatory Prepayment Event shall be applied to the outstanding principal and interest of the DIP Loan until fully paid.

**14.** **Closing and Administration Expenses**. Borrowers will pay Lender a reasonable sum for expenses and fees (including attorneys' fees), incurred by Lender in connection with the preparation, execution and delivery of this Agreement, the Financing Orders, and the attendant documents and the consummation of the transactions contemplated hereby and thereby on the earlier of (i) the date of an Event of Default; (ii) the date of the approval by the Bankruptcy Court of a sale of substantially all of the assets of the Borrowers, (iii) the effective date of a plan of reorganization of Borrowers in the Bankruptcy Case; or (iv) the Termination Date.

**15.** **Definitions**. In addition to the terms defined elsewhere in this Agreement, the following terms shall have the following meanings for purposes of this Agreement:

**15.1** "Affiliate" of any Person means (a) any Person that, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, (b) any Person who is a director or officer (i) of such Person, (ii) of any subsidiary of such Person or (iii) of any Person described in clause (a) above or (c) in the case of a trust, its protectors or trustees, any Person who is or has been a beneficiary thereof, or any Person who is or has been able to appoint a beneficiary thereof.  For purposes of this definition, "control" of a Person shall mean the power, direct or indirect, (i) to vote 10% or more of the securities having ordinary voting power for the election of directors of such Person, whether by ownership of securities, contract, proxy or otherwise, or (ii) to direct or cause the direction of the management and policies of such Person, whether by ownership of securities, contract, proxy or otherwise.

**15.2** "Bankruptcy Schedules" will mean the schedules and statement of financial affairs required to be filed by the Borrowers pursuant to the Bankruptcy Code and the Rules of Bankruptcy Procedure.

**15.3** "Carve-Out" means, subject to the terms and conditions contained in this Section 15.3, that the liens and priorities granted to Lender under this Agreement are subordinated to the following: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the Bankruptcy Administrator under 28 U.S.C. § 1930(a) plus interest at the statutory rate; (b) the payment of, to the extent allowed at any time by the Bankruptcy Court, whether by interim order, procedural

order or otherwise, unpaid fees and expenses incurred at any time by persons or firms retained by the Borrowers pursuant to 11 U.S.C. §§ 327, 328 or 363 and any statutory committee appointed in the Bankruptcy Case pursuant to 11 U.S.C. § 1102, which are allowed and payable under 11 U.S.C. §§ 330 and 331, in an aggregate amount for all such persons and firms not to exceed the amounts set forth in the approved Operating Budget for the fees and expenses of Professionals ("Allowed Administrative Fees"); and (c) the payment to Lender or to any affiliate of Lender of any breakup, topping or similar fee, and any expense reimbursement, that is approved at any time by the Bankruptcy Court in connection with the asset purchase agreement, stock purchase agreement or other transactional agreement to which Lender (or such affiliate) and Borrowers are parties. For the avoidance of doubt, the Carve-Out shall not be used to pay any professional fees or expenses incurred in connection with (i) asserting any claims or causes of action against Lender or any of its respective affiliates, officers, members or employees, (ii) challenging or raising any defense with respect to the obligations of Borrowers under this Agreement or the Financing Orders or any lien (whether pre-petition or post-petition) granted by Borrowers to Lender, or (iii) taking any action to contest, hinder, delay or interfere with the rights of Lender or any of its Affiliates.

15.4    "Default" means any event or condition that with the passage of time or the giving of notice, or both, would constitute an Event of Default.

15.5    "Environmental Laws" means all present or future federal, state and local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative or judicial orders, consent agreements, directed duties, requests, licenses, authorizations and permits of, and agreements with, any governmental authority, in each case relating to any matter arising out of or relating to public health and safety, or pollution or protection of the environment or workplace, including any of the foregoing relating to the presence, use, production, generation, handling, transport, treatment, storage, disposal, distribution, discharge, emission, release, threatened release, control or cleanup of any Hazardous Substance.

15.6    "Final Order" means an order of the Bankruptcy Court entered on a final basis, in form and substance satisfactory to Lender, which (a) contains substantially the same provisions as the Interim Order (including reaffirming (x) that Lender is extending credit to Borrowers in good faith (within the meaning of Section 364(e) of the Bankruptcy Code) under this Agreement and (y) the granting of liens and priority position provided in connection with the Interim Order), (b) contains the provisions set forth in the Interim Order to be included in the Final Order, and (c) is not subject to vacatur, amendment, modification, reversal or stay without Lender's prior written consent.

15.7    "Financing Orders" means, collectively, the Interim Order and the Final Order.

15.8    "Interim Order" means an order of the Bankruptcy Court entered on an emergency and/or interim basis, and after notice given and a hearing conducted in accordance with Bankruptcy Rule 4001(c) no later than fifteen (15) days after the Filing Date,

authorizing and approving the transactions contemplated in this Agreement and finding, among other things, that Lender is extending credit to the Borrowers in good faith within the meaning of Section 364(e) of the Bankruptcy Code, which order shall, on an interim basis, (i) approve the payment by Borrowers of the fees set forth in <u>Section 5</u> and the professional fees of Lender in connection with this Agreement and the interim funding authorized in said order, (ii) grant and approve the superpriority liens and security interests and administrative expense claims contemplated herein, (iii) grant adequate protection in favor of Lender, (iv) authorize the use by Borrowers of proceeds of pre-petition collateral that constitutes "cash collateral" (within the meaning of the Bankruptcy Code) in respect of liens and security interests granted pursuant to the Bridge Loan, (v) otherwise be in form and substance satisfactory to Lender and (vi) prior to the entry of the Final Order, be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified without Lender's prior written consent.

15.9    "<u>Lien</u>" means, with respect to any Person, any interest granted by such Person in any real or personal property, asset or other right owned or being purchased or acquired by such Person which secures payment or performance of any obligation and shall include any mortgage, lien, encumbrance, charge or other security interest of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

15.10   "<u>Loan Documents</u>" means this Agreement, any promissory issued under this Agreement, and any document or agreement entered into by Borrowers or any other Person pursuant to this Agreement for the purpose of complying with such Person's obligations to provide Collateral to Lender hereunder.

15.11   "<u>Obligations</u>" means all loans, advances, debts, liabilities, obligations, covenants and duties owing to Lender from Borrowers of any kind or nature, present or future, whether or not evidenced by any note, guaranty or other instrument, whether arising under this Agreement or under any other agreement, instrument or document, whether or not for the payment of money, whether arising by reason of indemnification or in any other manner, whether direct or indirect (including those acquired by assignment, participation, purchase, negotiation, discount or otherwise), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising and whether contemplated by Borrowers or Lender on the date hereof.

15.12   "<u>Person</u>" means any natural person, corporation, partnership, trust, limited liability company, association, governmental authority or unit, or any other entity, whether acting in an individual, fiduciary or other capacity.

15.13   "<u>Subsidiary</u>" and "<u>Subsidiaries</u>" shall mean, respectively, with respect to any Person, each and all such corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, joint ventures or other entities of which or in which such Person owns, directly or indirectly, such number of outstanding equity securities as have more than 50% of the ordinary voting power

19

for the election of directors or other managers of such corporation, partnership, limited liability company or other entity. Unless the context otherwise requires, each reference to Subsidiaries herein shall be a reference to Subsidiaries of the Borrowers.

**15.14** "Termination Date" means the earliest to occur of (a) Thirty (30) days after entry of the Interim Order if the Final Order has not been approved by the Bankruptcy Court on or prior to that date, (b) one hundred and fifty (150) days after entry of the Final Order, (c) approval by the Bankruptcy Court of the sale of substantially all of the assets of the Borrowers, (d) the effective date of a plan of reorganization under the Bankruptcy Case that has been confirmed pursuant to an order of the Bankruptcy Court or (e) such earlier date on which Lender's commitment to lend hereunder terminates in accordance with the terms of this Agreement.

**16.    General.**

**16.1    Indemnity.** Borrowers will indemnify, defend and hold harmless Lender, each of its Affiliates, and their respective directors, officers, counsel and employees, from and against all claims, demands, liabilities, judgments, losses, damages, costs and expenses, joint or several (including all accounting fees and attorneys' fees reasonably incurred), that Lender or any such indemnified party may incur arising under or by reason of this Agreement or any act hereunder or with respect hereto or thereto including but not limited to any of the foregoing relating to any act, mistake or failure to act in perfecting, maintaining, protecting or realizing on any collateral or lien thereon except for those arising out of the willful misconduct or gross negligence of such indemnified party. Without limiting the generality of the foregoing, Borrowers agree that if, after receipt by Lender of any payment of all or any part of the DIP Loan obligations, demand is made at any time upon Lender for the repayment or recovery of any amount or amounts received by it in payment or on account of the DIP Loan obligations and Lender repays all or any part of such amount or amounts by reason of any judgment, decree or order of any court or administrative body, or by reason of any settlement or compromise of any such demand, this Agreement will continue in full force and effect and Borrowers will be liable, and will indemnify, defend and hold harmless Lender for the amount or amounts so repaid. The provisions of this Section will be and remain effective notwithstanding any contrary action which may have been taken by Borrowers in reliance upon such payment, and any such contrary action taken will be without prejudice to Lender's rights under this Agreement and will be deemed to have been conditioned upon such payment having become final and irrevocable. The provisions of this Section will survive the expiration or termination of this Agreement.

**16.2    Continuing Agreement.** This Agreement is and is intended to be a continuing agreement and will remain in full force and effect until the DIP Loan is finally and irrevocably paid in full and this Agreement is terminated by a writing signed by Lender specifically terminating this Agreement.

16.3  **Priority Claims**. The DIP Loan and repayment thereof will constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a claim having priority over any and all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code, subject only to the Carve-Out. Lender agrees that subject to the terms hereof, Borrowers will be permitted to pay administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code, and compensation and reimbursement of expenses allowed and payable under Section 330 and 331 of the Bankruptcy Code, as the same may be due and payable.

16.4  **Priority of Liens**. Pursuant to Section 364(d)(1) of the Bankruptcy Code, the DIP Loan will be and are hereby secured by liens against the DIP Collateral. Such liens and security interests granted to Lender herein will have priority over all other liens against the DIP Collateral, subject only to the Carve-Out, and are effective, valid, perfected and enforceable as of the Petition Date without the necessity of filing or any other act or filing or recording of any security agreements, financing statements or any other instruments or documents, in any other jurisdictions. Lender's lien on the DIP Collateral will at all times be senior to the rights of all Persons subject only to the Carve-Out. Except for the Carve Out, any lien in and to the DIP Collateral other than liens in favor of Lender will be subordinated to or invalidated against Borrowers, but preserved for the benefit of the Borrowers' bankruptcy estate, will be subordinated in priority to the interests of Lender.

16.5  **Waiver of Claim**. In consideration of the DIP Loan to be made to the Borrowers hereunder, Borrowers hereby waive any claim they otherwise might have under Section 506(c) of the Bankruptcy Code and agrees that the property of Borrowers which secures the DIP Loan, including, without limitation, the DIP Collateral will not be charged with any costs or expenses under Section 506(c) of the Bankruptcy Code.

16.6  **No Third Party Beneficiaries**. Nothing express or implied herein is intended or will be construed to confer upon or give any Person, other than the parties hereto, any right or remedy hereunder or by reason hereof.

16.7  **No Partnership or Joint Venture**. Nothing contained herein or in any of the agreements or transactions contemplated hereby is intended or will be construed to create any relationship other than as expressly stated herein or therein and will not create any joint venture, partnership or other relationship.

16.8  **Waiver**. Lender's rights with respect to the DIP Collateral and other security for the DIP Loan and its security interest therein will continue unimpaired, and Borrowers will remain obligated in accordance with the terms hereof, notwithstanding the release or substitution of any DIP Collateral or other security for the DIP Loan at any time(s), or any rights or interest therein, or any delay, extension of time, renewal, compromise or other indulgence granted by Lender in reference to any DIP Loan obligations, and Borrowers hereby waive all notice of the same. No delay or omission on the part of Lender to exercise any right or power arising from any Event of Default will impair any such right or power or be

21

considered a waiver of any such right or power or a waiver of any such Event of Default or an acquiescence therein nor will the action or nonaction of Lender in case of such Event of Default impair any right or power arising as a result thereof or affect any subsequent default or any other default of the same or a different nature. No advance under the DIP Loan will constitute a waiver of any of the conditions to Lender's obligation to make further advances; nor, if Borrowers are unable to satisfy any such condition, will any such advance have the effect of precluding Lender from thereafter declaring such inability to be an Event of Default.

16.9    **Notices**.  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder will be in writing and will be conclusively deemed to have been received by a party hereto and to be effective if delivered personally to such party, or sent by overnight courier service, or by certified or registered mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or to such other address as any party may give to the other in writing for such purpose:

        To Lender:                    Noor Staffing Group, LLC
                                      c/o Frost Brown Todd LLP
                                      501 Grant Street, STE 800
                                      Pittsburgh, PA 15219
                                      Attn:  Jordan S. Blask, Esq.

        To Borrowers:                 Staffing 360 Solutions, Inc.
                                      c/o Bernstein-Burkley, P.C.
                                      601 Grant St 9th Floor
                                      Pittsburgh, PA 15219
                                      Attn: Kirk B. Burkley, Esq.

All such communications, if personally delivered, will be conclusively deemed to have been received by a party hereto and to be effective when so delivered, or if sent by overnight courier service, on the day after deposit thereof with such service, or if sent by certified or registered mail, on the third business day after the day on which deposited in the mail.

16.10    **Successors and Assigns**. This Agreement will be binding upon and inure to the benefit of Borrowers and Lender and their respective successors and assigns (including a successor trustee that may be approved in Borrowers' bankruptcy case), provided, however, that Borrowers may not assign this Agreement in whole or in part without the prior written consent of Lender and Lender at any time may assign this Agreement in whole or in part.

16.11    **Modifications**. This Agreement, the Financing Orders, and the other Loan Documents, constitute the entire agreement of the parties and supersede all prior agreements and understandings regarding the subject matter of this Agreement, including but not limited to any proposal or commitment letters.  No modification

22

or waiver of any provision of this Agreement, the Financing Orders, or any related document, nor consent to any departure by Borrowers therefrom, will be established by conduct, custom or course of dealing; and no modification, waiver or consent will in any event be effective unless the same is in writing and specifically refers to this Agreement, and then such waiver or consent will be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Borrowers in any case will entitle Borrowers to any other or further notice or demand in the same, similar or other circumstance.

16.12   **Remedies Cumulative**. No single or partial exercise of any right or remedy by Lender will preclude any other or further exercise thereof or the exercise of any other right or remedy. All remedies hereunder and in any instrument or document evidencing, securing, guaranteeing or relating to the DIP Loan or now or hereafter existing at law or in equity or by statute are cumulative and none of them will be exclusive of the others or any other remedy. All such rights and remedies may be exercised separately, successively, concurrently, independently or cumulatively from time to time and as often and in such order as Lender may deem appropriate.

16.13   **Illegality**. If fulfillment of any provision hereof or any transaction related hereto, at the time performance of such provision is due, involves transcending the limit of validity prescribed by law, then ipso facto, the obligation to be fulfilled will be reduced to the limit of such validity; and if any clause or provisions herein contained other than the provisions hereof pertaining to repayment of the DIP Loan operates or would prospectively operate to invalidate this Agreement in whole or in part, then such clause or provision only will be void, as though not herein contained, and the remainder of this Agreement will remain operative and in full force and effect.

16.14   **Counterparts**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed will be deemed to be an original and all of which taken together will constitute one and the same agreement. Any party so executing this Agreement by "pdf" or fax transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by "pdf" or fax transmission.

16.15   **Headings**. The headings in this Agreement are for convenience only and will not limit or otherwise affect any of the terms hereof.

16.16   **Governing Law**. THIS AGREEMENT WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICT OF LAWS PRINCIPLES AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

16.17   **Waiver of Jury Trial**. BORROWERS AND LENDER EACH WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING

TO THIS AGREEMENT, THE SECURITY DOCUMENTS OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH AGREEMENTS.

*[signature page follows]*

IN WITNESS WHEREOF, Borrowers and Lender have caused this Debtor-in-Possession Financing Agreement to be executed and delivered as of the date first set forth above.

<u>BORROWERS</u>:

**STAFFING 360 SOLUTIONS, INC.**
**MONROE STAFFING SERVICES, LLC**
**LIGHTHOUSE PLACEMENT SERVICES, INC.**
**HEADWAY WORKFORCE SOLUTIONS, INC.**
**KEY RESOURCE, INC.**

By:_____
Name: Brendan Flood
Title: CEO

<u>LENDER</u>:

**NOOR STRATEGIES, INC.**

By:_____
Name: Habib Noor
Title: CEO

[*Signature Page to Debtor-in-Possession Financing Agreement*]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | |
|---|---|
| IN RE:<br><br>HEADWAY WORKFORCE SOLUTIONS, INC., *et al.*[5]<br><br>         Debtor. | Bankruptcy No. 25-01682-5-JNC<br><br>Chapter 11<br><br>*(Joint Administration Requested)* |

### CERTIFICATE OF SERVICE

I, Kirk B. Burkley, 601 Grant Street, 9th Floor, Pittsburgh, PA 15219, hereby certify:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on the 15th day of May 2025, I served copies of the within Motion & the corresponding notices of the same on the parties listed below by depositing a copy thereof in an envelope bearing sufficient postage in the Priority United States mail or by CMECF as indicated.

I certify under penalty of perjury that the foregoing is true and correct.

EXECUTED ON: 5/15/2025

Respectfully submitted,
BERNSTEIN-BURKLEY, P.C.

By:/s/ Kirk B. Burkley

Kirk B. Burkley, Esq.
PA I.D.: 89511
601 Grant Street, 9th Floor
Pittsburgh, PA 15219
Phone: (412) 456-8108
Fax:    (412) 456-8135
Email: kburkley@bernsteinlaw.com
Counsel for Debtors

Brian Behr (via CM/ECF)
Office of the Bankruptcy Administrator

Pamela P. Keenan (via CM/ECF) – Counsel for Noor Staffing Group
Richard A. Prosser (via CM/ECF) – Counsel for Midcap Funding IV Trust

---

[5] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors Federal Employer Identification Number: Headway Workforce Solutions, Inc. (4871); Staffing 360 Solutions Inc., (0859); Monroe Staffing Services LLC (1204); Key Resources, Inc. (9495); Lighthouse Placement Services, Inc. (8093).

Via Priority US Mail – on the attached creditor matrices for each of the five Jointly Administered Debtors

Label Matrix for local noticing
0417-5
Case 25-01682-5-JNC
Eastern District of North Carolina
Raleigh
Mon May 12 11:03:04 EDT 2025

(p)BANKRUPTCY ADMINISTRATOR EDNC
434 FAYETTEVILLE STREET
SUITE 640
RALEIGH NC 27601-1888

Headway Workforce Solutions, Inc.
3100 Smoketree Court, Ste 900
Raleigh, NC 27604-1054

U. S. Bankruptcy Court
300 Fayetteville Street, 4th Floor
P.O. Box 791
Raleigh, NC 27602-0791

4MYBENEFITS, INC.
4600 McAuley Place
Suite 250
Blue Ash, OH 45242-4714

ADP
1 ADP Boulevard
Roseland, NJ 07068-1786

Accurate Employment Screening
7515 Irvine Center Drive
Irvine, CA 92618-2930

Auto Finance Company, LLC
378 Hunker Waltz Mill Rd
New Stanton, PA 15672

BIPA Settlement
c/o Jackson Lewis PC
75 Park Plaza, 4th Floor
Boston, MA 02116-3934

Becker Law, LLC
354 Eisenhower Parkway
SUite 1500
Livingston, NJ 07039-1023

Beyondsite, LLC
1942 Broadway
Ste 314C
Boulder, CO 80302-5233

Blank Rome LLP
2029 Century Park East
6th Floor
Los Angeles, CA 90067-2907

Case Anywhere LLC
21860 Burbank Blvd.
Suite 125
Woodland Hills, CA 91367-7447

Charlotte Douglas International Airport
5501 Josh Birmingham Pkwy
Charlotte, NC 28208-5750

Charter Communications
1813 Spring Garden St
Greensboro, NC 27403-2213

City of Huntington
800 5th Ave
Huntington, WV 25701-2002

Cogency Global Inc.
122 E. 42nd St.
Fl 18
New York, NY 10168-1899

Consensus Cloud Solutions, LLC
700 S. Flower St.
15th Floor
Los Angeles, CA 90017-4101

DP Smoketree, LLC
2900 Highwoods Blvd.
Suite 200
Raleigh, NC 27604-1036

Delaware Department of Labor
4425 North Market Street
Wilmington, DE 19802-1307

Eskill Corporation
122 E Houston St
Suite 105
San Antonio, TX 78205-2267

FEDEX
1000 Ridgeway Loop Road
Suite 500
Memphis, TN 38120-4081

Fadi Mawaghdeh - VTS
1095 Avenue of the Americas
14th Fl.
New York, NY 10036-6797

HAB-PPT
PO BOX 20087
Lehigh Valley, PA 18002-0087

HW Clearstar, Inc.
4800 East S. Main St.
Suite 150
Salt Lake City, UT 84121

Hickory Farms LLC
311 S Wacker Dr.
Suite 2030
Chicago, IL 60606-6753

Indeed Inc.
Mail Code 5160
P.O. Box 660367
Dallas, TX 75266-0367

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Jackson Lewis, P.C.
3737 Glenwood Avenue
Suite 450
Raleigh, NC 27612-5505

Jean Pierre Sakey
Chapel Hill Partners, LP
2639 Marchmont Street
Raleigh, NC 27608-2135

Kamil Wantura - VTS
1095 Avenue of the Americas
14th Fl.
New York, NY 10036-6797

Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309-4530

LMU Consulting Group
357 S McCaslin Blvd
Suite 200
Louisville, CO 80027-2932

Lais Pedroso
Order 66282 PO Box
Los Angeles, CA 90078-0066

North Carolina Department of Commerce
Div. of Employment Security
P.O. Box 26504
Raleigh, NC 27611-6504

North Carolina Department of Revenue
Bankruptcy Unit
P.O. Box 1168
Raleigh, NC 27602-1168

North Carolina Department of Revenue
Office Services Division
Bankruptcy Unit, P.O. Box 1168
Raleigh, NC 27602-1168

PRISMHR, INC.
35 Parkwood Dr.
Hopkinton, MA 01748-1727

Quadient Finance USA Inc
478 Wheelers Farms Rd
Milford, CT 06461-9139

Quadient Leasing USA INc
487 Wheelers Farms Rd
Milford, CT 06461

RINGCENTRAL INC
20 Davis Drive
Belmont, CA 94002-3002

Royal Cup, Inc.
4600 McAuley Place
Suite 250
Cincinnati, OH 45242-4714

SECUREDOCS INC
1360 Post Oak Blvd.
Suite 2200
Houston, TX 77056-3030

Sheakley Uniservice, Inc
9987 Carver Rd
Suite 300
Cincinnati, OH 45242-5563

Smith & Meyers LLP
355 S Grand Ave
Ste 2450
Los Angeles, CA 90071-9500

Smith, Anderson, Blount, Dorsett, Mitchell &
PO Box 2611
Raleigh, NC 27602-2611

Spark Equation Inc
311 S Wacker Dr.
Ste 5060
Chicago, IL 60606-6631

Staffing Connection Inc
920 Cassatt Rd.
Building 200, Suite 315
Berwyn, PA 19312-1178

(p)STERICYCLE INC
2355 WAUKEGAN ROAD
BANNOCKBURN IL 60015-1503

Sterling
PO Box 35626
Newark, NJ 07193-5626

Synel Americas, Inc.
8665 E Hartford Dr.
Scottsdale, AZ 85255-7804

Synergi Partners, Inc.
151 W Evans St
Florence, SC 29501-3425

TIMESAVED INC/ACTIVATESTAFF
202-19 Singer Ct
Toronto ON, M2K 0B2,

TPX Communications
3300 No. Cimarron Road
Las Vegas, NV 89129-8401

Tierpoint Hosted
12444 Powerscourt Dr.
Ste 450
Saint Louis, MO 63131-3632

Tristar Risk Enterprise Management Inc.
100 Oceangate
Suite 840
Long Beach, CA 90802-4346

Truist Bank
PO Box 400
Wilson, NC 27894-0400

VRC Companies, LLC
5384 Poplar Avenue
Suite 500
Memphis, TN 38119-3658

Wake County Tax Administration
301 South McDowell St
Raleigh, NC 27601-2090

Wells Fargo Financial Leasing
800 Walnut
Des Moines, IA 50309-3891

Windstream
4001 North Rodney Parham Rd.
Little Rock, AR 72212-2490

ZOOMINFO TECHNOLOGIES
805 Broadway Street
Suite 900
Vancouver, WA 98660-3506

Brendan Flood
3100 Smoketree Ct.
Ste 900
Raleigh, NC 27604-1054


Brent J. Lemon
Bernstein-Burkley, P.C.
601 Grant Street, 9th Floor
Pittsburgh, PA 15219-4430

Gwenyth A. Ortman
Bernstein-Burkley, P.C.
601 Grant Street, 9th Floor
Pittsburgh, PA 15219-4430

Harry W. Greenfield
Bernstein-Burkley, P.C.
1360 East Ninth Street, suite 1250
Cleveland, OH 44114-1754


Jason L. Hendren
Hendren Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612-3367

Kirk B. Burkley
Bernstein-Burkley, P.C.
601 Grant Street, 9th Floor
Pittsburgh, PA 15219-4430

Lydia C. Stoney
Hendren, Redwine & Malone, PLLC
4600 Marriott Drive
Suite 150
Raleigh, NC 27612-3367


Rebecca Redwine Grow
Hendren Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612-3367


The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


Bankruptcy Administrator
434 Fayetteville Street, Ste. 640
Raleigh, NC 27601

Stericycle, Inc.
2355 Waukegan Road
Deerfield, IL 60015


The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.


(u)Midcap Funding IV Trust

(u)Noor Staffing Group

(d)Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346


(u)Technosign

End of Label Matrix
Mailable recipients      69
Bypassed recipients       4
Total                    73

Label Matrix for local noticing
0417-5
Case 25-01684-5-JNC
Eastern District of North Carolina
Raleigh
Mon May 12 11:04:51 EDT 2025

(p)BANKRUPTCY ADMINISTRATOR EDNC
434 FAYETTEVILLE STREET
SUITE 640
RALEIGH NC 27601-1888

Staffing 360 Solutions, Inc.
757 3rd Avenue, 27th Floor
New York, NY 10017-2031

U. S. Bankruptcy Court
300 Fayetteville Street, 4th Floor
P.O. Box 791
Raleigh, NC 27602-0791

ADP, Inc.
400 W. Covina Blvd
San Dimas, CA 91773-2954

ATERA NETWORKS LTD
250 West 34th St, Fl 3
New York, NY 10119-2104

Acrisure
1265 Drummers Lane, Suite 300
Wayne, PA 19087-1570

Atlantic Direct Marketing LLC
10389 Orchard Way
Live Oak, CA 95953-2134

BROADRIDGE
1155 Long Island Avenue
Edgewood, NY 11717-8309

BYZANTINE PRODUCTIONS, INC.
8721 Santa Monica Boulevard, Suite 100,
West Hollywood, CA 90069-4507

Bancroft Capital, LLC
501 W Office Center Dr # 130
Fort Washington, PA 19034-3267

BrightEdge Technologies, Inc.
1500 W 3rd St #405
Cleveland, OH 44113-1423

CFO SOLUTIONS LLC
6 University Drive, Suite 206-209
Amherst, MA 01002-2360

COR Prominence, LLC
377 Oak Street  Concourse 2
Garden City, NY 11530-6542

CORNERSTONE VALUATION
PO Box 563
Midlothian, VA 23113-0563

Chapel Hill Partners LP
2639 Marchmont Street
Raleigh, NC 27608-2135

Chapel Hill Partners LP,  Advisory Agreement
2639 Marchmont Street
Raleigh, NC 27608-2135

Cogency Global Inc.
122 E. 42nd St.
Fl 18
New York, NY 10168-1899

(p)DONOHOE ADVISORY ASSOCIATES LLC
ATTN DONOHOE ADVISORY ASSOCIATES LLC
9801 WASHINGTONIAN BLVD STE 340
GAITHERSBURG MD 20878-7391

(p)DATASITE LLC
ATTN LEIF SIMPSON
THE BAKER CENTER
733 S MARQUETTE AVE SUITE 600
MINNEAPOLIS MN 55402-2357

Deloitte & Touche LLP
Rockefeller Plaza 41st floor
New York, NY 10112

HANCOCK FIRM VALUATION ADVISORS
4601 Washington Avenue
Houston, TX 77007-5471

HAYNES AND BOONE, LLP
30 Rockefeller Plaza, 26th Floor
New York, NY 10112-0086

Haley Marketing
6028 Sheridan Dr.
Buffalo, NY 14221-5813

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

JAMS, INC.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE
Suite 2800
Atlanta, GA 30309-4530

Kostelanetz LLP
7 World Trade Center
New York, NY 10007-0042

Kuuku Minnah-Donkoh, Esq.
Gordon Reese Scully Mansukhani LLP
One Battery Park Plaza, 28th Floor
New York, NY 10004-1582

M2 COMPLIANCE LLC
501 East Las Olas Blvd
Suite 300
Fort Lauderdale, FL 33301-2882

MEDIANT COMMUNICATIONS INC.
17 State Street
7th Floor
New York, NY 10004-1585

MEPT 757 THIRD AVENUE, LLC
28 Liberty St.
New York, NY 10005-1400

MORITT HOCK & HAMROFF
400 Garden City Plaza
2nd Floor
Garden City, NY 11530-3327

MUTUAL OF OMAHA
3300 Mutual Plaza
Omaha, NE 68175-0001

Mediant Communications Inc
400 Regency Forest Drive
Sutie 200
Cary, NC 27518-7702

NICHOLAS FLORIO
7 Carriage Way
Millstone Township, NJ 08510-8719

North Carolina Department of Commerce
Div. of Employment Security
P.O. Box 26504
Raleigh, NC 27611-6504

North Carolina Department of Revenue
Office Services Division
Bankruptcy Unit, P.O. Box 1168
Raleigh, NC 27602-1168

ODELL STUDNER GROUP
1265 Drummers Lane, Suite 300
Wayne, PA 19087-1570

ONESTREAM SOFTWARE LLC
191 N Chester St
Birmingham, MI 48009-3308

Oregon Department of Revenue
PO Box 14800
Salem, OR 97309-0920

Pamela D. Whittaker
1524 Boxthorne Lane
Winston Salem, NC 27106-4467

RBSM LLP
805 Third Avenue, Suite 1430
New York, NY 10022-7513

RICHARDS LAYTON & FINGER
920 N King St
Wilmington, DE 19801-3301

SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606-6448

SMART CHOICE COMMUNICATIONS,
P.O. Box 2693
New York, NY 10108-2693

Say Technologies LLC
85 Willow Road
Menlo Park, CA 94025-3656

Securities Transfer Corporation
2901 Dallas Pkwy Suite 380
Plano, TX 75093-5990

THE NASDAQ STOCK MARKET, LLC
151 West 42nd Street, Floors 26
New York, NY 10036-6563

THOMAS INTERNATIONAL
28175 Haggerty Rd
Novi, MI 48377-2903

The Marketing Junction
11 New Street, Northampton
NN7 4QS, UK,

The Moran Group, LLC
One Riverway, Suite 700
Houston, TX 77056-1988

Trustpoint.One
3200 Cobb Galleria Parkway Suite 200
Atlanta, GA 30339-5921

U.S. Securities & Exchange Commission
950 East Paces Ferry Rd., Suite 900
Atlanta, GA 30326-1382

UHY
1185 Avenue of the Americas, 38th Floor
New York, NY 10036-2603

UHY Advisors, Inc.
1185 Avenue of the Americas, 38th Floor
New York, NY 10036-2603

United Healthcare
3803 N. Elm St.
Greensboro, NC 27455-2593

VINCENT J. CEBULA
25 East 86th Street
New York, NY 10028-0553

White Rock Cybersecurity
9330 Lyndon B Johnson Fwy STE 850
Dallas, TX 75243-3485

Brendan Flood
3100 Smoketree Ct.
Ste 900
Raleigh, NC 27604-1054

Jason L. Hendren
Hendren Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612-3367

Lydia C. Stoney
Hendren, Redwine & Malone, PLLC
4600 Marriott Drive
Suite 150
Raleigh, NC 27612-3367

Rebecca Redwine Grow
Hendren Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612-3367

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Bankruptcy Administrator
434 Fayetteville Street, Ste. 640
Raleigh, NC 27601

DONOHOE ADVISORY ASSOCIATES LLC
9801 Washingtonian Blvd, Suite 340,
Gaithersburg, MD 20878

Datasite LLC
733 S. Marquette Ave, Suite 600
Minneapolis, MN 55402

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Midcap Funding IV Trust

(u)Noor Staffing Group

(u)PHILADELPHIA INSURANCE COMPANIES
One Bala Plaza, suite 100

End of Label Matrix
Mailable recipients    62
Bypassed recipients     3
Total                  65

Label Matrix for local noticing
0417-5
Case 25-01685-5-JNC
Eastern District of North Carolina
Raleigh
Mon May 12 11:06:31 EDT 2025

(p)BANKRUPTCY ADMINISTRATOR EDNC
434 FAYETTEVILLE STREET
SUITE 640
RALEIGH NC 27601-1888

Key Resources, Inc.
4 Oak Branch Drive, Suite 4-A
Greensboro, NC 27407-2394

U. S. Bankruptcy Court
300 Fayetteville Street, 4th Floor
P.O. Box 791
Raleigh, NC 27602-0791

4 Oak Greensboro Charter Communications
1813 Spring Garden St
Greensboro, NC 27403-2213

AAA Self Storage
135 Kriess Rd
Butler, PA 16001-8706

APEX BACKGROUND CHECKS
5710-K High Point Rd #197
Greensboro, NC 27407-7047

Charter Communications
400 Washington Blvd.
Stamford, CT 06902-6641

DAVID G. SOUTHERN
P.O. Box 2352
Kernersville, NC 27285-2352

(p)DE LAGE LANDEN FINANCIAL
ATTN LITIGATION & RECOVERY
1111 OLD EAGLE SCHOOL ROAD
WAYNE PA 19087-1453

DIGITAL DOLPHIN PRODUCTS
2900 N Green Valley Pkwy #111
Henderson, NV 89014-0408

DUKE ENERGY
PO Box 1090
Charlotte, NC 28201-1090

ELROD ELECTRICAL SERVICE, INC.
207 S. Westgate Drive, Suite E
Greensboro, NC 27407-1655

(p)GUILFORD COUNTY TAX DEPARTMENT
ATTN ELLIOTT THOMPSON
PO BOX 3138
GREENSBORO NC 27402-3138

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Jan-Pro Cleaning Systems
400 Bursca Dr #401
Bridgeville, PA 15017-1441

KOURY CORPORATION
2275 Vanstory St., Suite 200
Greensboro, NC 27403-3623

Lochness Medical Supplies Inc.
2775 Broadway Suite 100
Buffalo, NY 14227-1043

MFN Family, LLC
7901 4th St N Ste 300
Saint Petersburg, FL 33702-4399

North Carolina Department of Commerce
Div. of Employment Security
P.O. Box 26504
Raleigh, NC 27611-6504

North Carolina Department of Revenue
Bankruptcy Unit
P.O. Box 1168
Raleigh, NC 27602-1168

North Carolina Department of Revenue
Office Services Division
Bankruptcy Unit, P.O. Box 1168
Raleigh, NC 27602-1168

(p)PIEDMONT NATURAL GAS
525 S TRYON STREET
CHARLOTTE NC 28202-1839

Systel Business Equipment
P.O. Box 35870
Fayetteville, NC 28303-0870

VERIZON
500 Technology Drive, Suite 550
Weldon Spring, MO 63304-2225

W. SALEM CHARTER COMMUNICATIONS
1813 Spring Garden St
Greensboro, NC 27403-2213

Brendan Flood
3100 Smoketree Ct.
Ste 900
Raleigh, NC 27604-1054

Jason L. Hendren
Hendren Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612-3367

Lydia C. Stoney
Hendren, Redwine & Malone, PLLC
4600 Marriott Drive
Suite 150
Raleigh, NC 27612-3367

Rebecca Redwine Grow
Hendren Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612-3367

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Bankruptcy Administrator
434 Fayetteville Street, Ste. 640
Raleigh, NC 27601

DE LAGE LANDEN FINANCIAL SERVICES, INC.
1111 Old Eagle School Road
Wayne, PA 19087

Guilford County Tax Department
400 W Market St
Greensboro, NC 27401

PIEDMONT NATURAL GAS
P.O.BOX 1246, Charlotte
Charlotte, NC 28201

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Midcap Funding IV Trust

(u)Noor Staffing Group

End of Label Matrix
Mailable recipients    29
Bypassed recipients     2
Total                  31

Label Matrix for local noticing
0417-5
Case 25-01686-5-JNC
Eastern District of North Carolina
Raleigh
Mon May 12 11:07:59 EDT 2025

(p)BANKRUPTCY ADMINISTRATOR EDNC
434 FAYETTEVILLE STREET
SUITE 640
RALEIGH NC 27601-1888

Monroe Staffing Services, LLC
6 Research Drive, Ste 440
Shelton, CT 06484-6296

U. S. Bankruptcy Court
300 Fayetteville Street, 4th Floor
P.O. Box 791
Raleigh, NC 27602-0791

ACCURATE EMPLOYMENT SCREENING, LLC
200 Spectrum Center Drive, Suite 1100
Irvine, CA 92618-5006

AVIONTE LLC
4300 MarketPointe Drive, Suite 250
Bloomington, MN 55435-5435

American Express
P.O. Box 981531
El Paso, TX 79998-1531

CHOICE SCREENING
9800 Mt. Pyramid Ct. Suite 360
Englewood, CO 80112-2668

CareerStaff Unlimited LLC
7925 Jones Branch Drive, Suite 1100
McLean, VA 22102-5303

Cupp & Cupp Corporation
260 Second Street
Chelsea, MA 02150-1802

(p)CONNECTICUT DEPARTMENT OF REVENUE SERVICES
ATTN COLLECTIONS UNIT - BANKRUPTCY TEAM
450 COLUMBUS BLVD STE 1
HARTFORD CT 06103-1837

Department of Taxation and Finance
W.A. Harriman Campus
Building 9, Room 200
Albany, NY 12227-0001

EBM, INC.
35 Nutmeg Drive, Suite 210
Trumbull, CT 06611-5496

GEORGIA PACIFIC
133 PEACHTREE ST NE
STE 4810 #1847
Atlanta, GA 30303-1821

Georgia Department of Revenue
Compliance Division - Central Collection
2595 Century Pkwy NE, Suite 331
Atlanta, GA 30345-3173

Indeed Inc.
Mail Code 5160
P.O. Box 660367
Dallas, TX 75266-0367

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

(p)IOWA DEPARTMENT OF REVENUE
ATTN BANKRUPTCY UNIT
PO BOX 10471
DES MOINES IA 50306-0471

JACKSON LEWIS
One Bryant Park, 32nd Floor
New York, NY 10036-6728

KONICA MINOLTA
21146 Network Place
Chicago, IL 60673-1211

Kuuku Minnah-Donkoh, Esq.
Gordon Reese Scully Mansukhani LLP
One Battery Park Plaza, 28th Floor
New York, NY 10004-1582

Lightcast
232 North Almon Street
Moscow, ID 83843-2176

Massachusetts Department of Revenue
Bankruptcy Unit
PO Box 7090
Boston, MA 02204-7090

Michigan Department of Treasury
Collection/Bankruptcy Unit
P.O. Box 30168
Lansing, MI 48909-7668

NEW YORK POWER AUTHORITY
123 Main Street
White Plains, NY 10601-3170

New York State Department of Taxation & Fina
Bankruptcy Section
P O Box 5300
Albany, NY 12205-0300

North Carolina Department of Commerce
Div. of Employment Security
P.O. Box 26504
Raleigh, NC 27611-6504

North Carolina Department of Revenue
Office Services Division
Bankruptcy Unit, P.O. Box 1168
Raleigh, NC 27602-1168

Ohio Department of Taxation
Attn: Business Tax Division
PO Box 2678
Columbus, OH 43216-2678

PA Department of Revenue
PO Box 280904
Harrisburg, PA 17128-0904

PAGER DUTY
600 Townsend Street, Suite 125
San Francisco, CA 94103-4900

Pamela D.  Whitaker
1524 Boxthorne Lane
Winston Salem, NC 27106-4467

R.D. SCINTO INC.
1 Corporate Drive, Suite 100
Shelton, CT 06484-6243

RIET
Employer Tax Section, 1511 Pontiac Ave.,
Cranston, RI 02920

Rhode Island Division of Taxation
One Capitol Hill
Providence, RI 02908-5803

SOURCE INFOTECH INC.
P.O. Box 577
Edison, NJ 08818-0577

SUN LIFE FINANCIAL
96 Worcester Street
Wellesley Hills, MA 02481-3620

SUNZ Insurance Solutions
1301 6th Avenue West
Bradenton, FL 34205-7410

South Carolina Department of Revenue
Office of General Counsel, Attn: Bankrup
300A Outlet Pointe Blvd.
Columbia, SC 29210-5666

Sunz Insurance Company
1301 6th Avenue West
Bradenton, FL 34205-7410

Synergi Partners, Inc.
P.O. Box 5599
Florence, SC 29502-5599

TAKEDA
Sterlinga 8a, 91-425 Lodz, Poland

THOMAS & COMPANY
P.O. Box 64555
Cincinnati, OH 45264-0001

Tek Inspirations LLC
13573 Tabasco Cat Dr
Frisco, TX 75035-1330

Vermont Department of Taxes
PO Box 1881
Montpelier, VT 05601-1881

Virginia Department of Taxation
P.O. Box 1114
Richmond, VA 23218-1114

XEROX FINANCIAL SERVICES
P.O Box 830090
Philadelphia, PA 19181-0001

Brendan Flood
3100 Smoketree Ct.
Ste 900
Raleigh, NC 27604-1054

Jason L. Hendren
Hendren Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612-3367

Lydia C. Stoney
Hendren, Redwine & Malone, PLLC
4600 Marriott Drive
Suite 150
Raleigh, NC 27612-3367

Rebecca Redwine Grow
Hendren Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612-3367

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Bankruptcy Administrator
434 Fayetteville Street, Ste. 640
Raleigh, NC 27601

(d)Bankruptcy Administrator
434 Fayetteville Street
Suite 640
Raleigh, NC 27601

Department of Revenue Services
450 Columbus Blvd.
Suite 1
Hartford, CT 06103

Iowa Department of Revenue
PO Box 10330
Des Moines, IA 50306-0330

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Midcap Funding IV Trust                (u)Noor Staffing Group                          (u)NJ Division of Taxation
                                                                                           3 John Fitch Way, 5th Floor
                                                                                           PO Box 245

(u)NYS Employment Contribution and Taxes    End of Label Matrix
                                            Mailable recipients    50
                                            Bypassed recipients      4
                                            Total                   54

Label Matrix for local noticing
0417-5
Case 25-01687-5-JNC
Eastern District of North Carolina
Raleigh
Mon May 12 11:09:32 EDT 2025

(p)BANKRUPTCY ADMINISTRATOR EDNC
434 FAYETTEVILLE STREET
SUITE 640
RALEIGH NC 27601-1888

Lighthouse Placement Services, Inc.
55 Ferncroft Road, Ste 100
Danvers, MA 01923-4036

U. S. Bankruptcy Court
300 Fayetteville Street, 4th Floor
P.O. Box 791
Raleigh, NC 27602-0791

55 FERNCROFT ROAD LLC
55 Ferncroft Road, Ste 200
Danvers, MA 01923-4001

Accurate Employment Screening
7515 Irvine Center Drive
Irvine, CA 92618-2930

COMCAST BUSINESS
PO BOX 70219
Philadelphia, PA 19176-0219

CareCentrix / Sonoran Innovative Services
2306 E Fallen Leaf Ln
Phoenix, AZ 85024-0121

(p)COMPTROLLER OF MARYLAND
BANKRUPTCY UNIT
7 ST PAUL STREET SUITE 230
BALTIMORE MD 21202-1626

(p)CONNECTICUT DEPARTMENT OF REVENUE SERVICES
ATTN COLLECTIONS UNIT - BANKRUPTCY TEAM
450 COLUMBUS BLVD STE 1
HARTFORD CT 06103-1837

Department of Taxation and Finance
W.A. Harriman Campus
Building 9, Room 200
Albany, NY 12227-0001

Division of Revenue
Wilmington Office
820 N. French Street
Wilmington, DE 19801-3509

Internal Revenue Service
Dept. of Treasury, IRS
Holtsville, NY 11742

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

LIGHT EFFICIENT DESIGN
188 S Northwest Highway
Cary, IL 60013-2987

LinkedIn Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622

Massachusetts Department of Revenue
Bankruptcy Unit
PO Box 7090
Boston, MA 02204-7090

Mersen
374 Merrimac Street
Newburyport, MA 01950-1930

Michigan Department of Treasury / Attn Litig
430 West Allegan Street
2nd Floor, Austin Building
Lansing, MI 48922-0001

Minnesota Revenue
Collection Division
P.O. Box 64564
Saint Paul, MN 55164-0564

Morgan, Brown & Joy LLP
200 State St 11th Fl
Boston, MA 02109-2605

New York State Department of Taxation & Fina
Bankruptcy Section
P O Box 5300
Albany, NY 12205-0300

North Carolina Department of Commerce
Div. of Employment Security
P.O. Box 26504
Raleigh, NC 27611-6504

North Carolina Department of Revenye
Office Services Division
Bankruptcy Unit, P.O. Box 1168
Raleigh, NC 27602-1168

Ohio Department of Taxation
Attn: Business Tax Division
PO Box 2678
Columbus, OH 43216-2678

PA Department of Revenue
PO Box 280904
Harrisburg, PA 17128-0904

Quality Refreshment Services
214 CENTRAL ST
Hudson, NH 03051-4445

Solomontek LLC
311 N Rose Ave
Kannapolis, NC 28083-3538

Southbury Printing Center
385 Main St S #107
Southbury, CT 06488-4292

VYZE INC.
24718 Tribe Square
Sterling, VA 20166-2658

Vermont Department of Taxes
PO Box 1881
Montpelier, VT 05601-1881

Brendan Flood
3100 Smoketree Ct.
Ste 900
Raleigh, NC 27604-1054

Jason L. Hendren
Hendren Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612-3367

Lydia C. Stoney
Hendren, Redwine & Malone, PLLC
4600 Marriott Drive
Suite 150
Raleigh, NC 27612-3367

Rebecca Redwine Grow
Hendren Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612-3367

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Bankruptcy Administrator
434 Fayetteville Street, Ste. 640
Raleigh, NC 27601

(d)Bankruptcy Administrator
434 Fayetteville Street
Suite 640
Raleigh, NC 27601

Comptroller of Maryland
60 West Street
Suite 102
Annapolis, MD 21401

Department of Revenue Services
450 Columbus Blvd.
Suite 1
Hartford, CT 06103

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Midcap Funding IV Trust

(u)Noor Staffing Group

(u)NJ Division of Taxation
3 John Fitch Way, 5th Floor
PO Box 245

End of Label Matrix
Mailable recipients     34
Bypassed recipients      3
Total                   37